Gene Y. Kang, Esq.
Barry I. Levy, Esq. (to be admitted *pro hac vice*)
Max Gershenoff, Esq. (to be admitted *pro hac vice*)
Yonatan Bernstein, Esq.
RIVKIN RADLER LLP
25 Main Street, Suite 501
Court Plaza North
Hackensack, New Jersey 07601
(201) 287-2460
gene.kang@rivkin.com
*Counsel for Plaintiffs Government Employees Insurance
Co., GEICO Indemnity Co., GEICO General Insurance
Company and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY and GEICO CASUALTY CO., | Civil Action No.: |
| Plaintiffs, | **Plaintiffs Demand a Trial by Jury** |
| -against- | |
| JERSEY PREMIER PAIN LLC, JONATHAN MINGOIA, D.C., MICHAEL BARAN, RIVERSIDE PAIN MANAGEMENT LLC, EN-CHIA JAMES LIU, M.D., HUDSON RIVER RADIOLOGY CENTER, LLC, FERAS JALOUDI, and DANYAL ZUBERI, | |
| Defendants. | |

## **COMPLAINT**

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

**NATURE OF THE ACTION**

1.      This action seeks to recover more than $2,400,000.00 that the Defendants wrongfully obtained from GEICO by submitting:

(i)      thousands of fraudulent and unlawful no-fault insurance charges through Jersey Premier Pain LLC ("Jersey Premier") for purported initial examinations, follow-up examinations, chiropractic, and physical therapy services;

(ii)     hundreds of fraudulent and unlawful no-fault insurance charges through Riverside Pain Management LLC ("Riverside Pain") for purported initial examinations, follow-up examinations, and pain management injections; and

(iii)    thousands of fraudulent and unlawful no-fault insurance charges through Hudson River Radiology Center LLC ("Hudson Radiology") for purported radiology services including magnetic resonance imaging ("MRIs").

(the purported examinations, chiropractic services, physical therapy services, pain management injections, and radiology services are referred to hereinafter as the "Fraudulent Services").

2.      The Fraudulent Services purportedly were provided to individuals ("Insureds") who claimed to have been involved in automobile accidents and were eligible for insurance coverage under GEICO no-fault insurance policies.

3.      In addition, GEICO seeks a declaration that Jersey Premier, Riverside Pain, and Hudson Radiology were not in compliance with all significant laws and regulations governing healthcare practice in New Jersey.

4.      The Defendants fall into the following categories:

(i)      Defendant Jonathan Mingoia, D.C. ("Mingoia") is a chiropractor licensed to practice chiropractic in New Jersey, who, together with Defendant Michael Baran, owned and controlled Jersey Premier, and purported to perform many of the Fraudulent Services at Jersey Premier.

(ii)     Defendant Michael Baran ("Baran"), is not licensed as a chiropractor or as any other kind of healthcare professional, but nonetheless unlawfully owned and controlled Jersey Premier, together with Mingoia.

(iii)    Defendant Jersey Premier is a New Jersey limited liability company that operates as a chiropractic practice, through which many of the Fraudulent Services were billed to insurance companies, including GEICO.

(iv)    Defendant En-Chia James Liu, M.D. ("Liu") is a physician licensed to practice medicine in New Jersey, who purported to own and control Riverside Pain, and who purported to perform virtually all of the Fraudulent Services at Riverside Pain.

(v)    Defendant Riverside Pain is a New Jersey limited liability company that operates as a medical practice, through which many of the Fraudulent Services were billed to automobile insurance companies, including GEICO.

(vi)    Defendant Hudson Radiology is a New Jersey limited liability company that falsely purports to be properly licensed as an ambulatory care facility and to operate in compliance with material licensing and operating regulations, through which many of the Fraudulent Services were billed to insurance companies, including GEICO.

(vii)    Defendant Feras Jaloudi ("Jaloudi") is not licensed as a physician or other healthcare professional and, along with Defendant Danyal Zuberi, purported to own and control Hudson Radiology.

(viii)    Defendant Danyal Zuberi ("D. Zuberi") is not licensed as a physician or other healthcare professional and, along with Jaloudi, purported to own and control Hudson Radiology.

5.    As discussed below, the Defendants at all relevant times have known that:

(i)    the Fraudulent Services were not medically necessary, and were provided -- to the extent that they were performed at all -- pursuant to pre-determined fraudulent protocols designed to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)    in many cases, the Fraudulent Services never were legitimately provided in the first instance;

(iii)    the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iv)    the Defendants were engaged in unlawful referral schemes;

(v)    the Defendants were not eligible to receive payment for the Fraudulent Services because neither the Defendants nor the Fraudulent Services were in compliance with all significant laws and regulations governing healthcare practice in New Jersey.

6.    As such, the Defendants do not now have -- and never had -- any right to be compensated for the Fraudulent Services that they billed or caused to be billed to GEICO. The

charts annexed hereto as Exhibits "1" - "3" set forth a large representative sample of the fraudulent claims that have been identified to-date that the Defendants submitted, or caused to be submitted, to GEICO via the mails.

7.    The Defendants' interrelated fraudulent schemes began as early as 2016 and have continued uninterrupted since that time. As a result of the Defendants' interrelated schemes, GEICO has incurred damages of more than $2,400,000.00.

## THE PARTIES

### I.    Plaintiffs

8.    Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New Jersey.

### II.    Defendants

9.    Defendant Jersey Premier is a New Jersey limited liability company with its principal place of business in New Jersey, and operated as a professional chiropractic practice. Jersey Premier was organized in New Jersey on or about August 21, 2015, had Mingoia and Baran as its members and owners, and was used by Mingoia and Baran as a vehicle to submit fraudulent and unlawful billing to GEICO and other insurers.

10.    Defendant Mingoia resides in and is a citizen of New Jersey. Mingoia was licensed to practice chiropractic in New Jersey on or about February 9, 2006, together with Baran owned and controlled Jersey Premier, purported to provide many of the Fraudulent Services at Jersey Premier, and used Jersey Premier as a vehicle to submit fraudulent and unlawful billing to GEICO and other insurers.

11.   Defendant Baran resides in and is a citizen of New Jersey. Though Baran is not licensed as a physician, chiropractor, or other professional healthcare practitioner, Baran unlawfully owned and controlled Jersey Premier, a professional chiropractic practice. Together with Mingoia, Baran caused billing for the Fraudulent Services to be submitted through Jersey Premier to GEICO and other insurers.

12.   Defendant Riverside Pain is a New Jersey limited liability company with its principal place of business in New Jersey, and operated as a professional medical practice. Riverside Pain was organized in New Jersey on or about October 22, 2015, had Liu as its owner and member, and was used by Liu as a vehicle to submit fraudulent and unlawful billing to GEICO and other insurers.

13.   Defendant Liu resides in and is a citizen of New Jersey. Liu was licensed to practice medicine in New Jersey on or about May 11, 2009, owned and controlled Riverside Pain, and purported to perform virtually all of the Fraudulent Services at Riverside Pain.

14.   Defendant Hudson Radiology is a New Jersey limited liability company with its principal place of business in New Jersey, which purported to be properly licensed as a New Jersey ambulatory care facility. Hudson Radiology was organized in New Jersey on or about October 23, 2015, purported to be owned and controlled by D. Zuberi and Jaloudi and to have them as its members, but was also secretly and unlawfully owned and controlled by a convicted criminal named Rehan Zuberi ("R. Zuberi"), who upon information and belief is D. Zuberi's father.

15.   Hudson Radiology operated four diagnostic imaging facilities -- including facilities located at: 550 Newark Avenue, Jersey City, New Jersey; 547 Summit Avenue, Jersey City, New Jersey; 120-48th Street, Union City, New Jersey; and 516 Hamburg Turnpike, Wayne, New Jersey

-- and was used by Jaloudi and D. Zuberi as a vehicle to submit fraudulent and unlawful billing to GEICO and other insurers.

16.     Defendant Jaloudi resides in and is a citizen of New Jersey. Jaloudi, together with D. Zuberi and R. Zuberi, owned and controlled Hudson Radiology.

17.     Defendant D. Zuberi resides in and is a citizen of New Jersey, and upon information and belief is R. Zuberi's son. D. Zuberi, together Jaloudi and R. Zuberi, owned and controlled Hudson Radiology.

### III.     Other Pertinent Individuals and Entities

18.     Although they are not named as Defendants in this action, American Imaging of Jersey City, American Imaging of Union City, American Imaging Center of Wayne a/k/a Medical and Molecular Imaging Wayne Inc. (collectively the "American Imaging Facilities"), R. Zuberi, and Rohit Gupta ("Gupta") are relevant to understanding the Defendants' fraudulent scheme and the claims brought in this action.

19.     The American Imaging Facilities were incorporated or organized under the names of various of R. Zuberi's family members to conceal R. Zuberi's actual ownership interests in them, because R. Zuberi had previously been convicted of various crimes and, as a result of his convictions, could not legally own, manage, or operate ambulatory care facilities, such as the American Imaging Facilities, in New Jersey.

20.     In particular, in 1998, R. Zuberi was convicted of second degree theft by deception, as well as second degree financial facilitation of criminal activity, in connection with his participation in a scheme to defraud New Jersey Medicaid of millions of dollars. As a result of his convictions, R. Zuberi was sentenced to six years in prison and was debarred from the Medicaid program.

21.     In keeping with the fact that R. Zuberi secretly and illegally owned and controlled the American Imaging Facilities, in a July 2016 affidavit, Gupta -- a longtime business associate of R. Zuberi who was arrested with him -- swore that: (i) R. Zuberi had ownership interests in the American Imaging Facilities; and (ii) R. Zuberi participated in the management and operation of the American Imaging Facilities.

22.     Gupta also swore in the July 2016 affidavit that virtually all the revenues to the American Imaging Facilities were generated through unlawful compensation that R. Zuberi provided to the American Imaging Facilities' referral sources in exchange for patient referrals.

23.     In keeping with the fact that the American Imaging Facilities' modus operandi was to provide unlawful compensation in exchange for patient referrals, in May 2015 Zuberi pleaded guilty to charges of first-degree financial facilitation of criminal activity and second-degree conspiracy to commit commercial bribery in connection with his role as owner of the American Imaging Facilities.

24.     In connection with his guilty plea, Zuberi admitted that the American Imaging Facilities paid physicians in exchange for patient referrals, and also admitted that he involved his family members in these schemes.

25.     Hudson Radiology was used by D. Zuberi, Jaloudi, and R. Zuberi to continue the fraudulent and unlawful insurance schemes that R. Zuberi and his associates previously carried out at the American Imaging Facilities.

26.     For instance, Hudson Radiology operates out of the same locations as the American Imaging Facilities, submits billing to GEICO under the same Tax Identification Number as the American Imaging Facilities, bills for the same kinds of diagnostic imaging services in the same

fraudulent and unlawful manner as the American Imaging Facilities, and shares common ownership with the American Imaging Facilities.

## JURISDICTION AND VENUE

27.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

28.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

29.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

30.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the District of New Jersey is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

**I.      An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement**

**A.      The New Jersey No-Fault Laws**

31.     New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B--1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A--1 et seq.)(collectively referred to as the "No Fault Laws"), which require automobile insurers to provide Personal Injury Protection Benefits ("PIP Benefits") to Insureds.

32.     Under the No Fault Laws, an Insured can assign his or her right to PIP Benefits to healthcare services providers in exchange for those services. Pursuant to a duly executed assignment, a healthcare services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form").

**B.     No-Fault Reimbursement and Compliance With New Jersey Law Governing Healthcare Practice**

33.     In order for a healthcare services provider to be eligible to receive PIP Benefits, it must comply with all significant laws and regulations governing healthcare practice in New Jersey.

34.     Thus, a healthcare services provider is not entitled to receive PIP Benefits where it has failed to comply with all significant statutory and regulatory requirements governing healthcare practice in New Jersey, whether or not the underlying services were medically necessary.

35.     Moreover, in order for a specific healthcare service to be eligible for PIP reimbursement, the service itself must be provided in compliance with all significant laws and regulations governing healthcare practice in New Jersey.

36.     By extension, insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare services providers, or for healthcare services, that are not in compliance with all significant statutory and regulatory requirements governing healthcare practice in New Jersey.

**C.     Pertinent New Jersey Law Governing Ambulatory Care Facilities**

37.     New Jersey law sets various requirements regarding the licensure and operation of ambulatory care facilities in New Jersey. Among other things, N.J.A.C. 8:43A-7.2 -- N.J.A.C.

8:43A-7.4 require every ambulatory care facility in New Jersey to have a qualified physician on staff as medical director to "be responsible for the direction, provision, and quality of medical services provided to patients", including "[d]eveloping and maintaining written objectives, policies, a procedure manual, an organizational plan, and a quality assurance program for the medical service." The medical director also must develop, implement, and review "written medical policies, including medical staff bylaws, in cooperation with the medical staff."

38.    What is more:

(i)    N.J.A.C. 8:43A-2.2 provides that "[a]ny person, organization, or corporation desiring to operate an ambulatory care facility shall make application to the Commissioner for a license on forms prescribed by the Department, which are available from the Office of Certificate of Need and Healthcare Facility Licensure."

(ii)    N.J.A.C. 8:43A-3.3(a) requires ambulatory care facilities to disclose their ownership to the New Jersey Department of Health ("NJDOH"), and to report "any proposed change in ownership to the Director of the Office of Certificate of Need and Healthcare Facility Licensing in writing at least 30 days prior to the change and in conformance with requirements for Certificate of Need applications."

(iii)    N.J.A.C. 8:43A-3.3(b) precludes ambulatory care facilities from being "owned, managed, or operated by any person convicted of a crime relating adversely to the person's capability of owning, managing, or operating the facility."

39.    Ambulatory care facilities in New Jersey that fail to comply with these requirements, or the other significant regulatory and licensing requirements applicable to ambulatory care facilities, are not eligible to receive PIP Benefits.

**D.    Pertinent New Jersey Law Regarding the Ownership of Chiropractic Practices**

40.    Under New Jersey law, there are a limited number of permissible business structures that may offer chiropractic professional services. See N.J.A.C. 13:44E-2.15.

41.    Pursuant to N.J.A.C. 13:44E-2.15, a chiropractic practice may lawfully be organized as a limited liability company, so long as "all members are chiropractic physicians or a

combination of chiropractic physicians and closely allied health care professionals…." See N.J.A.C. 13:44E-2.15(c).

42.     Therefore, chiropractic practices that are structured as a limited liability companies, and have members who are not licensed healthcare professionals, are not lawfully organized pursuant to N.J.A.C. 13:44E-2.15(c) and are therefore not eligible to receive PIP Benefits.

**E.     Pertinent New Jersey Law Regarding the Payment or Receipt of Compensation in Exchange for Patient Referrals**

43.     Pursuant to N.J.A.C. 13:35-6.17, physicians are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

44.     Among other things, N.J.A.C. 13:35-6.17(c)(1) specifies that:

A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value, or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including: purchasing a medical product, ordering or promoting the sale or lease of a device or appliance or other prescribed item, prescribing any type of item or product for patient use or making or receiving a referral to or from another for professional services. For example, a licensee who refers a patient to a healthcare service (such as a cardiac rehabilitation service or a provider of durable medical equipment or a provider of testing services) shall not accept from nor give to the healthcare service a fee directly or indirectly in connection with the referral, whether denominated as a referral or prescription fee or consulting or supervision fee or space leasing in which to render the services (other than as permitted in (h) below), or by any other name … .

(Emphasis added).

45.     N.J.A.C. 13:35-6.17(c)(1)(ii) specifies that "[t]his section shall be construed broadly to effectuate its remedial intent."

46.     In keeping with the broad anti-kickback prohibitions in N.J.A.C. 13:35-6.17(c)(1), N.J.A.C. 13:35-6.17(h) provides, in pertinent part, that:

A Board licensee may lease space or medical equipment to or from another licensed health care professional to whom patients are referred, only where rent is a fixed fee set in advance and determined by the fair market value, or less, and is for a regular term and not for sporadic use of the space.

47.     Similarly, pursuant to N.J.A.C. 13:44E-2.6, chiropractors are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

48.     In keeping with the general proscription against the payment of compensation in exchange for patient referrals (see N.J.A.C. 13:35-6.17; N.J.A.C. 13:44E-2.6), and the specific provisions of N.J.A.C. 13:35-6.17 that are aimed at preventing illegal referral fees from being disguised as ostensibly-legitimate "rent" payments (see N.J.A.C. 13:35-6.17(h)), N.J.A.C. 13:44E-3.9 provides -- in pertinent part -- that:

> A chiropractic physician requesting that another chiropractic physician or other practitioner perform any diagnostic tests shall … [n]ot refer a patient to another practitioner practicing at the same premises …, unless: … [t]hat other practitioner is a bona fide partner, fellow shareholder of a professional service corporation or other permitted practice structure, or a regularly salaried practitioner-employee of the chiropractic physician requesting the performance of a diagnostic test … .

49.     N.J.A.C. 13:44E-3.1 defines "practitioner" as "a licensee of a professional board authorized to render health care services, including, but not limited to, chiropractic physicians, medical doctors, podiatric physicians, physical therapists and registered professional nurses."

50.     N.J.A.C. 13:44E-3.1 defines "diagnostic test" to include "a professional service utilizing biomechanical, neurological, neurodiagnostic, radiological, vascular or any means, other than bioanalysis, intended to assist in establishing a diagnosis, for the purpose of recommending a course of treatment for the tested patient to be implemented by a chiropractic physician or other treating practitioner."

51.     Thus, pursuant to N.J.A.C. 13:44E-3.9, a chiropractor may not refer a patient to a physician practicing at the same premises as the chiropractor, for any types of professional services other than bioanalysis that are aimed at establishing a diagnosis for use in recommending a course

of treatment, unless the physician actually is the chiropractor's bona fide partner, fellow shareholder in a professional entity, or regularly salaried employee.

52.     Physicians, chiropractors, medical practices, and chiropractic practices that pay or receive compensation in exchange for patient referrals or otherwise engage in unlawful referral schemes are not eligible to receive PIP Benefits.

**F.     No-Fault Reimbursement, Medical Necessity, and the New Jersey No-Fault Care Paths**

53.     Pursuant to N.J.S.A. 39:6A--4, an insurer such as GEICO is only required to pay PIP Benefits for reasonable, necessary, and appropriate treatment. At the same time, a healthcare services provider is only eligible to receive PIP Benefits for medically necessary services.

54.     Pursuant to N.J.S.A. 39:6A--2(m):

"Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury

(i)     is not primarily for the convenience of the injured person or provider;

(ii)    is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization; and

(iii)   does not involve unnecessary diagnostic testing.

55.     Pursuant to the No-Fault Laws, the New Jersey Commissioner of Banking and Insurance (the "Commissioner") has designated specific care paths (the "Care Paths") as the standard course of medically necessary treatment for certain types of neck and back soft tissue injuries that commonly are sustained in automobile accidents. See N.J.A.C. 11:3--4.6.

56.     Specifically, the Commissioner has promulgated Care Paths for the following types of injuries:

(i)      cervical spine strains, sprains, and contusions;

(ii)     cervical herniated disks or radiculopathies;

(iii)    thoracic spine strains, sprains, and contusions;

(iv)     thoracic herniated disks or radiculopathies;

(v)      lumbar--sacral spine strains, sprains, and contusions; and

(vi)     lumbar--sacral herniated disks or radiculopathies.

57.     The Care Paths generally provide for an initial, four--week course of conservative treatment including chiropractic services, physical therapy, medication, and exercise.

58.     Should a healthcare services provider wish to provide additional treatment to an Insured beyond the initial four weeks of conservative treatment, the Care Paths require the provider to demonstrate at the four week mark, the eight week mark, and the 13 week mark that continued treatment is warranted based on the Insured's individual circumstances. See New Jersey Department of Banking and Insurance Comments, 30 N.J.R. 4401(a).

59.     The guidelines established by the Commissioner in the Care Paths are designed to avoid the continuation of treatment and therapy, week after week, over many months and years, without any observable improvement. See 30 N.J.R. 4401(a).

**G.      The Fee Schedule and Current Procedural Terminology Codes**

60.     New Jersey has established a medical fee schedule (the "Fee Schedule") that is applicable to claims for PIP Benefits.

61.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner

in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

62.     The No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A--4.6; N.J.A.C. 11:3--29.6.

63.     The New Jersey Administrative Code provides that the Fee Schedule shall be interpreted in accordance with the Medicare Claims Processing Manual ("MCPM"), the National Correct Coding Initiative ("NCCI") Policy Manual, and the American Medical Association's CPT Assistant (the "CPT Assistant").

64.     Additionally, healthcare providers and insurers are directed to use the NCCI "Edits" in determining whether or not CPT codes must be bundled or can be billed separately, i.e., unbundled. The NCCI Edits define when two CPT codes should not be reported together either in all situations or most situations.

65.     The MCPM, NCCI Policy Manual, NCCI Edits, and CPT Assistant are all incorporated by reference into the New Jersey no-fault insurance regulations. See N.J.A.C. 11:3--29.4.

66.     With respect to unbundling, N.J.A.C. 11:3--29.4 provides that:

Artificially separating or partitioning what is inherently one total Procedure into subparts that are integral to the whole for the purpose of increasing medical fees is prohibited.

67.     Chapter 1 of the NCCI Policy manual provides that:

Procedures should be reported with the most comprehensive CPT code that describes the services performed. Physicians must not unbundle the services described by a HCPCS/CPT code.

68.     Chapter 12 of the MCPM provides that:

The narrative for many CPT codes includes a parenthetical statement that the Procedure represents a 'separate Procedure.' The inclusion of this statement indicates that the Procedure, while possible to perform separately, is generally included in a more comprehensive Procedure, and the service is not to be billed when a related, more comprehensive, service is performed.

## H.    The New Jersey Insurance Fraud Prevention Act

69.    New Jersey has a strong public policy against insurance fraud. This policy is manifested in a series of statutes, including the Insurance Fraud Prevention Act ("IFPA"), N.J.S.A. 17:33A--1 et seq. A healthcare services provider violates the IFPA if, among other things, it:

Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or in opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

Conceals or knowing fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled.

See N.J.S.A. 17:33A--4.

70.    A healthcare services provider also violates the IFPA if it either: (i) "knowingly assists, conspires with or urges any person or practitioner to violate any of the provisions of this act"; or (ii) "knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act." Id.

71.    Violators of the IFPA are liable to the insurer for restitution, attorney's fees, and the reasonable costs of the insurer's investigation. See N.J.S.A 17:33A--7(a).

72.    A person that engages in a pattern of fraudulent behavior under the IFPA is liable to the insurer for treble damages. See N.J.S.A. 17:33A--7(b).

## II.   The Defendants' Interrelated, Fraudulent, and Unlawful Schemes

73.     Beginning no later than 2016, and continuing through the present day, the Defendants masterminded and implemented interrelated fraudulent and unlawful schemes in which they submitted thousands of bills to GEICO for medically unnecessary, illusory, unlawful, and otherwise non-reimbursable services.

### A.     Jersey Premier's Unlawful Corporate Structure

74.     As set forth above, chiropractic practices organized as limited liability companies may not have unlicensed laypersons as members. See N.J.A.C. 13:44E-2.15(c).

75.     Even so, between August 21, 2015 and the present, Baran -- who held no professional healthcare license -- unlawfully was a member and manager of Jersey Premier.

76.     Between August 21, 2015 and the present, Mingoia, Baran, and Jersey Premier billed GEICO hundreds of thousands of dollars for Fraudulent Services purportedly provided through Jersey Premier, and GEICO paid Mingoia, Baran, and Jersey Premier more than $800,000.00 in reliance on those charges, despite the fact that -- during this period -- Jersey Premier had an unlawful ownership structure.

77.     All the billing that Mingoia, Baran, and Jersey Premier submitted through Jersey Premier falsely represented that Jersey Premier and the underlying Fraudulent Services were in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.

78.     In fact, neither Jersey Premier nor the Fraudulent Services billed through Jersey Premier to GEICO were in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, because Jersey Premier -- a chiropractic limited liability company -- had Baran, an unlicensed layperson, as a member.

17

**B.   Hudson Radiology's Unlawful Corporate Structure**

79.   Hudson Radiology purported to be properly licensed as an ambulatory care facility.

80.   Therefore, pursuant to New Jersey law, R. Zuberi could not lawfully own, manage, or operate Hudson Radiology, because his criminal convictions related adversely to his capability of owning, managing, or operating such facilities. See N.J.A.C. 8:43A-3.3(b).

81.   R. Zuberi knew that he could not lawfully own, manage, or operate any ambulatory care facilities in New Jersey, because his criminal record related adversely to his capability of owning, managing, or operating such facilities. See N.J.A.C. 8:43A-3.3(b).

82.   Accordingly, R. Zuberi embarked on a secret scheme with Jaloudi and his son, D. Zuberi, whereby Jaloudi and D. Zuberi agreed to falsely represent, in Hudson Radiology's corporate filings and New Jersey ambulatory care facility licensing applications, that they owned Hudson Radiology, when in actuality they ceded true ownership and control over Hudson Radiology to R. Zuberi.

83.   In keeping with the fact that D. Zuberi was not a true owner of Hudson Radiology, D. Zuberi is only 23 years old and is not a licensed healthcare provider, and, upon information and belief based on database searches, has no prior experience running a diagnostic imaging center.

84.   At all relevant times, R. Zuberi has unlawfully owned, managed, and operated Hudson Radiology.

**C.   The Unlawful Referrals Between Jersey Premier and Riverside Pain**

85.   Jersey Premier, Mingoia, and Baran provided referrals to Riverside Pain and Liu in exchange for illegal compensation.

86.   In order to bill GEICO and other automobile insurers for their Fraudulent Services, including patient examinations and pain management injections, Riverside Pain and Liu needed to obtain patient referrals from other healthcare providers.

87.    At the same time, Jersey Premier, Mingoia, and Baran wanted to submit as much billing for chiropractic and physical therapy services as possible to GEICO and other insurers, without regard for whether the underlying chiropractic and physical therapy services were medically necessary.

88.    However, to the extent that the Insureds in the claims set forth in Exhibits "1" and "2" suffered any injuries at all in their automobile accidents, they virtually always were minor soft tissue injuries such as sprains or strains, which virtually always resolve after a short course of conservative treatment, or no treatment at all.

89.    Because ordinary soft tissue injuries such as sprains or strains virtually always resolve after a short course of conservative treatment, or no treatment at all, the Care Paths require healthcare services providers to demonstrate why continued treatment is necessary beyond the four-week, eight-week, and 13-week marks.

90.    As a result, Jersey Premier, Mingoia, and Baran knew that their ability to submit and obtain payment on large amounts of chiropractic billing to GEICO and other automobile insurers would be limited by the Care Paths, inasmuch as they would not be able to demonstrate that the Insureds required additional chiropractic or physical therapy services beyond the first four or eight weeks of treatment, much less the 13--week mark.

91.    Jersey Premier, Mingoia, and Baran also knew that -- pursuant to the Care Paths -- it would be much easier for them to obtain payment on large amounts of no-fault insurance billing for medically unnecessary chiropractic and physical therapy services if a licensed physician or physicians were to generate reports and diagnoses that purported to reflect injuries more serious than ordinary strains and sprains.

92.     Accordingly, Jersey Premier, Mingoia, and Baran entered into a secret agreement with Riverside Pain and Liu, whereby Jersey Premier, Mingoia, and Baran would refer Insureds to Riverside Pain and Liu for expensive examinations and pain management injections, regardless of the Insureds' need for, or -- in many cases -- the total absence of any need for, such examinations and pain management injections.

93.     In exchange for the medically unnecessary referrals, Riverside Pain and Liu provided unlawful compensation to Jersey Premier, Mingoia, and Baran.

94.     The unlawful compensation was provided in the form of: (i) ostensibly legitimate payments to "lease" space at the offices of Jersey Premier, Mingoia, and Baran, which actually were disguised compensation paid in exchange for patient referrals; and (ii) false contentions that the Insureds continued to suffer from significant levels of pain and other symptoms as the result of their relatively minor automobile accidents, thereby enabling Jersey Premier, Mingoia, and Baran to bill for additional, medically unnecessary chiropractic services and/or physical therapy services.

95.     In reality, these were "pay-to-play" arrangements that caused Jersey Premier, Mingoia, and Baran to provide access to Insureds and to refer Insureds to Riverside Pain and Liu for medically unwarranted examinations and pain management injections, regardless of the Insureds' need for such examinations and services.

96.     In keeping with the fact that these ostensibly legitimate "rent" payments actually were disguised kickbacks in exchange for patient referrals, Riverside Pain operated from Jersey Premier's office on only a "sporadic" basis. See N.J.A.C. 13:35-6.17(h).

97.     For example, Riverside Pain did not maintain regular office hours at Jersey Premier's office. Rather, it appeared at Jersey Premier's offices on different days each month, only

when Jersey Premier, Mingoia, and Baran had patients to refer to Riverside Pain pursuant to the unlawful referral scheme.

98.     In further keeping with the fact that the putative "rent" payments were not for fixed fees set in advance, and did not cover any regular lease terms, Jersey Premier's office did not contain any external signage or other indicia of Riverside Pain and Liu's ongoing presence at the offices.

99.     In keeping with the fact that Jersey Premier, Mingoia, and Baran's continued provision of chiropractic and physical therapy treatment were not predicated on medical necessity, the Defendants' own records indicated that Jersey Premier, Mingoia, and Baran's prior chiropractic and physical therapy treatment had not been effective in resolving the Insureds' supposed complaints.

100.    For example:

(i)     On February 5, 2018, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to MC's vehicle and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not complain of any pain at the scene. In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as the result of the accident, they were of low or minimal severity.  Even so, MC thereafter sought treatment from Jersey Premier, Mingoia, and Baran, where MC purportedly received physical therapy and chiropractic treatments between February 2018 and April 2018. In or about April 2018, Jersey Premier, Mingoia, and Baran caused MC to be referred to Riverside Pain pursuant to the Defendants' unlawful referral agreement. Thereafter, on April 26, 2018, Liu purported to examine MC on behalf of Riverside Pain and falsely reported that MC continued to suffer from significant levels of pain. Though the physical therapy and chiropractic treatments that Jersey Premier, Mingoia, and Baran purportedly had provided supposedly had been ineffective in resolving MC's putative symptoms, Liu nonetheless referred MC back to Jersey Premier for continued physical therapy and chiropractic treatments at the conclusion of the April 26, 2018 examination. However, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier  did not take any action based on Liu's purported diagnosis. To the contrary, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier purported to provide substantially similar physical therapy and

chiropractic services to MC as they had before they referred MC to Riverside Pain. Later, Riverside Pain and Liu provided another examination of MC on November 10, 2018, and again referred MC back to Jersey Premier for continued physical therapy treatments, despite the fact that -- by that point -- MC had received approximately eight months of physical therapy that supposedly had been ineffective in resolving MC's putative symptoms. These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Jersey Premier to Riverside Pain.

(ii)     On February 13, 2018, an Insured named IH was involved in an automobile accident. The contemporaneous police report indicated that IH was not injured and did not complain of any pain at the scene. In keeping with the fact that IH was not seriously injured, IH did not visit any hospital emergency room following the accident. To the extent that IH experienced any health problems at all as the result of the accident, they were of low or minimal severity.  Even so, IH thereafter sought treatment from Jersey Premier, Mingoia, and Baran, where IH purportedly received physical therapy and chiropractic treatments between February 2018 and May 2018. In or about May 2018, Jersey Premier, Mingoia, and Baran caused IH to be referred to Riverside Pain pursuant to the Defendants' unlawful referral agreement. Thereafter, on May 15, 2018, Liu purported to examine IH on behalf of Riverside Pain and falsely reported that IH continued to suffer from significant levels of pain. Though the physical therapy and chiropractic treatments that Jersey Premier, Mingoia, and Baran purportedly had provided supposedly had been ineffective in resolving IH's putative symptoms, Liu nonetheless referred IH back to Jersey Premier for continued physical therapy and chiropractic treatments at the conclusion of the May 15, 2018 examination. However, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier  did not take any action based on Liu's purported diagnosis. To the contrary, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier  purported to provide substantially similar physical therapy and chiropractic services to IH as they had before they referred IH to Riverside Pain. Later, Riverside Pain and Liu provided another examination of IH on August 9, 2018, and again referred IH back to Jersey Premier for continued physical therapy treatments, despite the fact that -- by that point -- IH had received more than seven months of physical therapy and chiropractic that supposedly had been ineffective in resolving IH's putative symptoms. These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Jersey Premier to Riverside Pain.

(iii)    On July 1, 2018, an Insured named HM was involved in an automobile accident. The contemporaneous police report indicated that HM was not injured and did not complain of any pain at the scene. Nonetheless, two days later, on July 3, 2018, HM traveled on her own to the Hoboken University Medical Center Emergency Department. The contemporaneous hospital records indicated that HM was briefly observed on an outpatient basis and then discharged with a cervicalgia diagnosis. To the extent that HM experienced any health problems at all as the result of the accident, they were of low or minimal severity.  Even so, HM thereafter sought

treatment from Jersey Premier, Mingoia, and Baran, where HM purportedly received physical therapy and chiropractic treatments between July 2018 and October 2018. In or about October 2018, Jersey Premier, Mingoia, and Baran caused HM to be referred to Riverside Pain pursuant to the Defendants' unlawful referral agreement. Thereafter, on October 16, 2018, Liu purported to examine HM on behalf of Riverside Pain and falsely reported that HM continued to suffer from significant levels of pain. Though the physical therapy and chiropractic treatments that Jersey Premier, Mingoia, and Baran purportedly had provided supposedly had been ineffective in resolving HM's putative symptoms, Liu nonetheless referred HM back to Jersey Premier for continued physical therapy and chiropractic treatments at the conclusion of the October 16, 2018 examination. However, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier did not take any action based on Liu's purported diagnosis. To the contrary, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier purported to provide substantially similar physical therapy and chiropractic services to HM as they had before they referred HM to Riverside Pain. Later, Riverside Pain and Liu provided another examination of HM on January 24, 2019, and again referred HM back to Jersey Premier for continued physical therapy treatments, despite the fact that -- by that point -- HM had received approximately six months of physical therapy that supposedly had been ineffective in resolving HM's putative symptoms. These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Jersey Premier to Riverside Pain.

(iv)  On July 5, 2019, an Insured named TT was involved in an automobile accident. The contemporaneous police report indicated that TT's vehicle was drivable following the accident. The police report further indicated that TT was not injured and did not complain of any pain at the scene. In keeping with the fact that TT was not seriously injured, TT did not visit any hospital emergency room following the accident. To the extent that TT experienced any health problems at all as the result of the accident, they were of low or minimal severity.  Even so, TT thereafter sought treatment from Jersey Premier, Mingoia, and Baran, where TT purportedly received physical therapy and chiropractic treatments between August 2019 and October 2019. In or about October 2019, Jersey Premier, Mingoia, and Baran caused TT to be referred to Riverside Pain pursuant to the Defendants' unlawful referral agreement. Thereafter, on October 10, 2019, Liu purported to examine TT on behalf of Riverside Pain and falsely reported that TT continued to suffer from significant levels of pain. Though the physical therapy and chiropractic treatments that Jersey Premier, Mingoia, and Baran purportedly had provided supposedly had been ineffective in resolving TT's putative symptoms, Liu nonetheless referred TT back to Jersey Premier for continued physical therapy and chiropractic treatments at the conclusion of the October 10, 2019 examination. However, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier did not take any action based on Liu's purported diagnosis. To the contrary, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier purported to provide substantially similar physical therapy and chiropractic services to TT as they had before they referred TT to Riverside Pain. Later, Riverside Pain and Liu provided another examination

of TT on May 26, 2020, and again referred TT back to Jersey Premier for continued physical therapy treatments, despite the fact that -- by that point -- TT had received more than nine months of physical therapy that supposedly had been ineffective in resolving TT's putative symptoms. These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Jersey Premier to Riverside Pain.

(v)     On October 31, 2019, an Insured named TD was involved in an automobile accident. The contemporaneous police report indicated that TD' vehicles was drivable following the accident. The police report further indicated that TD was not injured and did not complain of any pain at the scene. To the extent that TD experienced any health problems at all as the result of the accident, they were of low or minimal severity.  Even so, TD thereafter sought treatment from Jersey Premier, Mingoia, and Baran, where TD purportedly received physical therapy and chiropractic treatments between November 2019 and January 2020. In or about January 2020, Jersey Premier, Mingoia, and Baran caused TD to be referred to Riverside Pain pursuant to the Defendants' unlawful referral agreement. Thereafter, on January 23, 2020, Liu purported to examine TD on behalf of Riverside Pain and falsely reported that TD continued to suffer from significant levels of pain. Though the physical therapy and chiropractic treatments that Jersey Premier, Mingoia, and Baran purportedly had provided supposedly had been ineffective in resolving TD's putative symptoms, Liu nonetheless referred TD back to Jersey Premier for continued physical therapy and chiropractic treatments at the conclusion of the January 23, 2020 examination. However, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier  did not take any action based on Liu's purported diagnosis. To the contrary, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier  purported to provide substantially similar physical therapy and chiropractic services to TD as they had before they referred TD to Riverside Pain. Later, Riverside Pain and Liu provided another examination of TD on July 28, 2020, and again referred TD back to Jersey Premier for continued physical therapy and chiropractic treatments, despite the fact that -- by that point -- TD had received more than eight months of physical therapy and chiropractic treatments that supposedly had been ineffective in resolving TD's putative symptoms. These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Jersey Premier to Riverside Pain.

(vi)    On February 8, 2020, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated JC was not injured in the accident and did not complain of any pain at the scene. In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as the result of the accident, they were of low or minimal severity.  Even so, JC thereafter sought treatment from Jersey Premier, Mingoia, and Baran, where JC purportedly received physical therapy and chiropractic treatments between February 2020 and May 2020. In or about May  2020, Jersey Premier, Mingoia, and Baran caused JC to be referred to Riverside Pain pursuant to the Defendants' unlawful referral agreement.

Thereafter, on May 21, 2020, Liu purported to examine JC on behalf of Riverside Pain and falsely reported that JC continued to suffer from significant levels of pain. Though the physical therapy treatments that Jersey Premier, Mingoia, and Baran purportedly had provided supposedly had been ineffective in resolving JC's putative symptoms, Liu nonetheless referred JC back to Jersey Premier for continued physical therapy treatments at the conclusion of the May 21, 2020 examination. However, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier did not take any action based on Liu's purported diagnosis. To the contrary, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier purported to provide substantially similar physical therapy services to JC as they had before they referred JC to Riverside Pain. Later, Riverside Pain and Liu provided another examination of JC on March 25, 2021, and again referred JC back to Jersey Premier for continued physical therapy treatments, despite the fact that -- by that point -- JC had received more than thirteen months of physical therapy that supposedly had been ineffective in resolving JC's putative symptoms. These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Jersey Premier to Riverside Pain.

(vii)   On February 14, 2020, an Insured named HA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to HA's vehicle and that HA's vehicle was drivable following the accident. The police report further indicated that HA was not injured and did not complain of any pain at the scene. In keeping with the fact that HA was not seriously injured, HA did not visit any hospital emergency room following the accident. To the extent that HA experienced any health problems at all as the result of the accident, they were of low or minimal severity.  Even so, HA thereafter sought treatment from Jersey Premier, Mingoia, and Baran, where HA purportedly received physical therapy and chiropractic treatments between July 2020 and October 2020. In or about October 2020, Jersey Premier, Mingoia, and Baran caused HA to be referred to Riverside Pain pursuant to the Defendants' unlawful referral agreement. Thereafter, on October 20, 2020, Liu purported to examine HA on behalf of Riverside Pain and falsely reported that HA continued to suffer from significant levels of pain. Though the physical therapy and chiropractic treatments that Jersey Premier, Mingoia, and Baran purportedly had provided supposedly had been ineffective in resolving HA's putative symptoms, Liu nonetheless referred HA back to Jersey Premier for continued physical therapy and chiropractic treatments at the conclusion of the October 20, 2020 examination. However, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier did not take any action based on Liu's purported diagnosis. To the contrary, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier  purported to provide substantially similar physical therapy and chiropractic services to HA as they had before they referred HA to Riverside Pain. This medically unnecessary return referral was unlawful compensation for the initial, medically unnecessary referral from Jersey Premier to Riverside Pain.

(viii)    On December 23, 2020, an Insured named LA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to LA's vehicle and that LA's vehicle  was drivable following the accident. The police report further indicated that although LA complained of pain to her neck, she refused medical attention at the scene. In keeping with the fact that LA was not seriously injured, LA did not visit any hospital emergency room following the accident. To the extent that LA experienced any health problems at all as the result of the accident, they were of low or minimal severity.  Even so, LA thereafter sought treatment from Jersey Premier, Mingoia, and Baran, where LA purportedly received physical therapy and chiropractic treatments between January 2021 and April 2021. In or about April 2021, Jersey Premier, Mingoia, and Baran caused LA to be referred to Riverside Pain pursuant to the Defendants' unlawful referral agreement. Thereafter, on April 8, 2021, Liu purported to examine LA on behalf of Riverside Pain and falsely reported that LA continued to suffer from significant levels of pain. Though the physical therapy and chiropractic treatments that Jersey Premier, Mingoia, and Baran purportedly had provided supposedly had been ineffective in resolving LA's putative symptoms, Liu nonetheless referred LA back to Jersey Premier for continued physical therapy and chiropractic treatments at the conclusion of the April 8, 2021 examination. However, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier  did not take any action based on Liu's purported diagnosis. To the contrary, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier  purported to provide substantially similar physical therapy and chiropractic services to LA as they had before they referred LA to Riverside Pain. Later, Riverside Pain and Liu provided another examination of LA on September 28, 2021, and again referred LA back to Jersey Premier for continued physical therapy and chiropractic treatments, despite the fact that -- by that point -- LA had received more than nine months of physical therapy and chiropractic treatments that supposedly had been ineffective in resolving LA's putative symptoms.  These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Jersey Premier to Riverside Pain.

(ix)    On April 10, 2021, an Insured named YC was involved in an automobile accident. The contemporaneous police report indicated that YC's vehicle was drivable following the accident. The police report further indicated that YC was not injured and did not complain of any pain at the scene. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low or minimal severity.  Even so, YC thereafter sought treatment from Jersey Premier, Mingoia, and Baran, where YC purportedly received physical therapy and chiropractic treatments between June 2021 and August  2021. In or about August 2021, Jersey Premier, Mingoia, and Baran caused YC to be referred to Riverside Pain pursuant to the Defendants' unlawful referral agreement. Thereafter, on August 17, 2021, Liu purported to examine YC on behalf of Riverside Pain and falsely reported that YC continued to suffer from significant levels of pain. Though the physical therapy and chiropractic treatments that Jersey

Premier, Mingoia, and Baran purportedly had provided supposedly had been ineffective in resolving YC's putative symptoms, Liu nonetheless referred YC back to Jersey Premier for continued physical therapy and chiropractic treatments at the conclusion of the August 17, 2021 examination. However, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier did not take any action based on Liu's purported diagnosis. To the contrary, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier purported to provide substantially similar physical therapy and chiropractic services to YC as they had before they referred YC to Riverside Pain. Later, Riverside Pain and Liu provided another examination of YC on November 11, 2021, and again referred YC back to Jersey Premier for continued physical therapy and chiropractic treatments, despite the fact that -- by that point -- YC had received more than five months of physical therapy that supposedly had been ineffective in resolving YC's putative symptoms. These medically unnecessary return referrals were unlawful compensation for the initial, medically unnecessary referral from Jersey Premier to Riverside Pain.

(x)     On June 4, 2021, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that MG's vehicle was drivable following the accident. The police report further indicated that although MG complained of pain to her head, she refused medical attention at the scene. In keeping with the fact that MG was not seriously injured, MG did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as the result of the accident, they were low or minimal severity. Even so, MG thereafter sought treatment from Jersey Premier, Mingoia, and Baran, where MG purportedly received physical therapy and chiropractic treatments between July 2021 and September 2021. In or about September 2021, Jersey Premier, Mingoia, and Baran caused MG to be referred to Riverside Pain pursuant to the Defendants' unlawful referral agreement. Thereafter, on September 9, 2021, Liu purported to examine MG on behalf of Riverside Pain and falsely reported that MG continued to suffer from significant levels of pain. Though the physical therapy and chiropractic treatments that Jersey Premier, Mingoia, and Baran purportedly had provided supposedly had been ineffective in resolving MG's putative symptoms, Liu nonetheless referred MG back to Jersey Premier for continued physical therapy and chiropractic treatments at the conclusion of the September 9, 2021 examination. However, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier did not take any action based on Liu's purported diagnosis. To the contrary, Jersey Premier, Mingoia, Baran, and other providers at Jersey Premier purported to provide substantially similar physical therapy and chiropractic services to MG as they had before they referred MG to Riverside Pain. This medically unnecessary return referral was unlawful compensation for the initial, medically unnecessary referral from Jersey Premier to Riverside Pain.

101.     These are only representative examples. In the claims identified in Exhibits "1" and "2", Jersey Premier, Mingoia, and Baran routinely referred Insureds to Riverside Pain and Liu, or caused them to be referred, in exchange for unlawful compensation from Riverside Pain and Liu.

**D.     The Unlawful Referrals from Jersey Premier to Hudson Radiology**

102.     Hudson Radiology's ability to bill GEICO and other automobile insurers for Fraudulent Services depended upon its ability to gain access to Insureds.

103.     However, in the claims identified in Exhibits "1" and "3", the Insureds generally did not require MRIs, because they had been involved in relatively minor accidents to the extent that they were involved in actual accidents at all.

104.     Moreover, there are many radiology practices in New Jersey that are able to provide radiology services -- including MRIs -- to automobile accident victims, and that were more reputable than Hudson Radiology.

105.     Upon information and belief, the lack of medical necessity for the Defendants' Fraudulent Services and the plethora of similar and more reputable radiology practices in the market, made it difficult for Hudson Radiology to obtain legitimate referrals from legitimate referral sources.

106.     Accordingly, Hudson Radiology, Jaloudi, D. Zuberi, and R. Zuberi entered into a secret scheme with Jersey Premier, Mingoia, and Baran, whereby they agreed to pay unlawful compensation in exchange for patient referrals from Jersey Premier to Hudson Radiology for medically unnecessary MRIs and other radiology services.

107.     In keeping with the fact that Hudson Radiology, Jaloudi, D. Zuberi, and R. Zuberi paid unlawful compensation in exchange for patient referrals to Hudson Radiology, the payment of unlawful compensation in exchange for patient referrals was the regular way in which R. Zuberi and his family members, including D. Zuberi, operated their diagnostic facilities.

108.    In keeping with the fact that Hudson Radiology, Jaloudi, D. Zuberi, and R. Zuberi paid unlawful compensation in exchange for patient referrals to Hudson Radiology, most of the insureds identified in Exhibits "1" and "3" either had no presenting problems at all as a result of their relatively minor automobile accidents, or else minor soft tissue injuries such as sprains and strains, and did not require radiology services such as MRIs as the result of the minor accidents they experienced or purported to experience.

109.    For instance, in many of the claims identified in Exhibits "1" and "3" the contemporaneous police reports indicated that that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

110.    What is more, in the claims identified in Exhibits "1" and "3", to the extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain, strain, or similar soft tissue injury diagnosis.

111.    In a legitimate clinical setting, MRIs should not be used as an initial form of diagnostic imaging in the treatment of patients complaining of soft tissue injuries such as sprains and strains secondary to automobile accidents.

112.    For example, the American College of Radiology -- an almost 100 year-old professional organization with a mission to serve patients and society by empowering members to advance the practice, science and professions of radiological care -- has indicated that MRIs usually are not appropriate as a first-line diagnostic tool in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

113.    Along similar lines, the American College of Physicians -- a more than 100 year-old professional organization with a mission to enhance the quality and effectiveness of health care

29

by fostering excellence and professionalism in the practice of medicine -- likewise has indicated that MRIs usually are not appropriate as a first-line diagnostic tool in the treatment of patients complaining of soft tissue injuries secondary to automobile accidents.

114.    In fact, in a legitimate clinical setting, patients suffering from soft tissue injuries such as strains or sprains secondary to automobile accidents should not receive MRIs until they receive at least four to eight weeks of conservative treatment.

115.    This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and unnecessary diagnostic imaging can be counterproductive and can even be harmful to the patient.

116.    Even so -- and in keeping with the fact that Jersey Premier, Mingoia, and Baran referred Insureds to Hudson Radiology in exchange for unlawful compensation from Hudson Radiology, Jaloudi, D. Zuberi, and R. Zuberi -- Jersey Premier, Mingoia, and Baran routinely caused Insureds to be referred to Hudson Radiology for medically unnecessary MRIs, as a first-line diagnostic tool, soon after the Insureds' minor accidents before the Insureds legitimately could have failed a course of conservative treatment.

117.    For example:

(i)    On February 5, 2018, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to MC's vehicle and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not complain of any pain at the scene. In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as the result of the accident, they were of low or minimal severity, and MC did not require any MRIs as a result of his accident, especially before the Insured legitimately tried and failed a course of conservative treatment. Even so, pursuant to the Defendants' unlawful referral agreement, on or about February 12, 2018 -- just seven days after the accident -- Jersey Premier, Mingoia, and Baran caused MC to be referred to Hudson Radiology

for medically unnecessary MRI's in exchange for unlawful compensation from Hudson Radiology, Jaloudi, D. Zuberi, and R. Zuberi.

(ii)     On February 13, 2018, an Insured named IH was involved in an automobile accident. The contemporaneous police report indicated that IH was not injured and did not complain of any pain at the scene. In keeping with the fact that IH was not seriously injured, IH did not visit any hospital emergency room following the accident. To the extent that IH experienced any health problems at all as the result of the accident, they were of low or minimal severity, and IH did not require any MRIs as a result of his accident, especially before the Insured legitimately tried and failed a course of conservative treatment.. Even so, pursuant to the Defendants' unlawful referral agreement, on or about February 23, 2018 -- just seven days after the accident -- Jersey Premier, Mingoia, and Baran caused IH to be referred to Hudson Radiology for medically unnecessary MRI's in exchange for unlawful compensation from Hudson Radiology, Jaloudi, D. Zuberi, and R. Zuberi.

(iii)    On July 1, 2018, an Insured named HM was involved in an automobile accident. The contemporaneous police report indicated that HM was not injured and did not complain of any pain at the scene. Nonetheless, two days later, on July 3, 2018, HM traveled on her own to the Hoboken University Medical Center Emergency Department. The contemporaneous hospital records indicated that HM was briefly observed on an outpatient basis and then discharged with a cervicalgia diagnosis. To the extent that HM experienced any health problems at all as the result of the accident, they were of low or minimal severity, and HM did not require any MRIs as a result of his accident, especially before the Insured legitimately tried and failed a course of conservative treatment. Even so, pursuant to the Defendants' unlawful referral agreement, on or about July 31, 2018 -- less than one month after the accident -- Jersey Premier, Mingoia, and Baran caused HM to be referred to Hudson Radiology for medically unnecessary MRI's in exchange for unlawful compensation from Hudson Radiology, Jaloudi, D. Zuberi, and R. Zuberi.

(iv)     On July 5, 2019, an Insured named TT was involved in an automobile accident. The contemporaneous police report indicated that TT's vehicle was drivable following the accident. The police report further indicated that TT was not injured and did not complain of any pain at the scene. In keeping with the fact that TT was not seriously injured, TT did not visit any hospital emergency room following the accident. To the extent that TT experienced any health problems at all as the result of the accident, they were of low or minimal severity, and TT did not require any MRIs as a result of his accident. Even so, pursuant to the Defendants' unlawful referral agreement, in or about October 2019, Jersey Premier, Mingoia, and Baran caused TT to be referred to Hudson Radiology for medically unnecessary MRI's in exchange for unlawful compensation from Hudson Radiology, Jaloudi, D. Zuberi, and R. Zuberi.

(v)      On October 31, 2019, an Insured named TD was involved in an automobile accident. The contemporaneous police report indicated that TD's vehicles was

drivable following the accident. The police report further indicated that TD was not injured and did not complain of any pain at the scene. To the extent that TD experienced any health problems at all as the result of the accident, they were of low or minimal severity, and TD did not require any MRIs as a result of his accident. Even so, pursuant to the Defendants' unlawful referral agreement, in or about December 2019, Jersey Premier, Mingoia, and Baran caused TD to be referred to Hudson Radiology for medically unnecessary MRI's in exchange for unlawful compensation from Hudson Radiology, Jaloudi, D. Zuberi, and R. Zuberi.

(vi)     On August 2, 2019, an Insured named KA was involved in an automobile accident. The contemporaneous police report indicated that KA' vehicles was drivable following the accident. The police report further indicated that KA was not injured and did not complain of any pain at the scene. In keeping with the fact that KA was not seriously injured, KA did not visit any hospital emergency room following the accident. To the extent that KA experienced any health problems at all as the result of the accident, they were of low or minimal severity, and KA did not require any MRIs as a result of his accident, especially before the Insured legitimately tried and failed a course of conservative treatment.. Even so, pursuant to the Defendants' unlawful referral agreement, in or about August 9, 2019 -- just seven days after the accident -- Jersey Premier, Mingoia, and Baran caused KA to be referred to Hudson Radiology for medically unnecessary MRI's in exchange for unlawful compensation from Hudson Radiology, Jaloudi, D. Zuberi, and R. Zuberi.

(vii)    On February 8, 2020, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated JC was not injured in the accident and did not complain of any pain at the scene. In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident.. To the extent that JC experienced any health problems at all as a result of the accident, they were of low or minimal severity, and JC did not require any MRIs as a result of the accident, especially before the Insured legitimately tried and failed a course of conservative treatment.. Even so, pursuant to the Defendants' unlawful referral agreement, in or about February 29, 2020 -- less than 4 weeks after the accident -- Jersey Premier, Mingoia, and Baran caused JC to be referred to Hudson Radiology for medically unnecessary MRI's in exchange for unlawful compensation from Hudson Radiology, Jaloudi, D. Zuberi, and R. Zuberi.

(viii)   On February 14, 2020, an Insured named HA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to HA's vehicle and that HA's vehicle was drivable following the accident. The police report further indicated that HA was not injured and did not complain of any pain at the scene. In keeping with the fact that HA was not seriously injured, HA did not visit any hospital emergency room following the accident. To the extent that HA experienced any health problems at all as a result of the accident, they were of low severity, and  HA did not require any MRI's as a result of the accident. Even so, pursuant to the Defendants' unlawful referral agreement, in or about September 2020, Jersey Premier, Mingoia, and Baran caused HA to be referred to Hudson

Radiology for medically unnecessary MRI's in exchange for unlawful compensation from Hudson Radiology, Jaloudi, D. Zuberi, and R. Zuberi.

(ix)     On December 23, 2020, an Insured named LA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to LA's vehicle and that LA's vehicle was drivable following the accident. The police report further indicated that although LA complained of pain to her neck, she refused medical attention at the scene. In keeping with the fact that LA was not seriously injured, LA did not visit any hospital emergency room following the accident. To the extent that LA experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset and had completely resolved within two to three months of the accident. LA did not require any MRIs as a result of his accident. Even so, pursuant to the Defendants' unlawful referral agreement, in or about March 2021, Jersey Premier, Mingoia, and Baran caused LA to be referred to Hudson Radiology for medically unnecessary MRI's in exchange for unlawful compensation from Hudson Radiology, Jaloudi, D. Zuberi, and R. Zuberi.

(x)      On June 4, 2021, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that MG's vehicle was drivable following the accident. The police report further indicated that although MG complained of pain to her head, she refused medical attention at the scene. In keeping with the fact that MG was not seriously injured, MG did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as a result of the accident, they were of low or minimal severity at the outset and had completely resolved within two to three months of the accident. MG did not require any MRIs as a result of his accident. Even so, pursuant to the Defendants' unlawful referral agreement, in or about January 2022, Jersey Premier, Mingoia, and Baran caused MG to be referred to Hudson Radiology for a medically unnecessary MRI in exchange for unlawful compensation from Hudson Radiology, Jaloudi, D. Zuberi, and R. Zuberi.

118.    These are only representative examples. In the claims identified in Exhibits "1" and "3", Jersey Premier, Mingoia, and Baran frequently referred the Insureds to Hudson Radiology for MRIs, regardless of the Insureds' need for, or -- in many cases -- the total absence of any need for, such MRIs, in exchange for unlawful compensation from Hudson Radiology, Jaloudi, D. Zuberi, and R. Zuberi, and often before the Insured could have legitimately tried and failed a course of conservative treatment.

119.    Moreover, in a legitimate clinical setting, it is improbable -- to the point of impossibility -- that a large cohort of patients involved in minor automobile accidents not only would suffer injuries to both their cervical <u>and</u> lumbar or thoracic spines as the result of the minor accidents, but would suffer injuries serious enough to genuinely warrant both cervical <u>and</u> lumbar or thoracic MRIs.

120.    Even so, and in keeping with the fact that the MRIs identified in the claims in Exhibit "1" were medically unnecessary, and were performed pursuant to the Defendants' unlawful referral scheme, Hudson Radiology, Jaloudi, D. Zuberi, and R. Zuberi routinely purported to provide <u>both</u> cervical <u>and</u> lumbar MRIs with respect to Insureds who had not been seriously injured in their accidents and did not plausibly require both cervical and lumbar MRIs (or any MRIs).

121.    In further keeping with the fact that the MRIs at Hudson Radiology were not medically necessary, Victor Tambini -- Hudson Radiology's administrator -- alleged in a complaint filed in the District of New Jersey that Hudson Radiology hired "unqualified personnel" to run its MRI machines, and that at least one of the MRI technicians at Hudson Radiology had a forged license.

122.    In all of the claims identified in Exhibits "1" and "3", the Defendants falsely represented that they were in compliance with all relevant laws governing healthcare practice in New Jersey, and therefore were eligible to collect PIP Benefits in the first instance.

123.    In fact, Jersey Premier, Mingoia, Baran, Hudson Radiology, Jaloudi, D. Zuberi, and R. Zuberi were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and were not eligible to collect PIP Benefits in the first instance, inasmuch as they paid and/or received illegal compensation in exchange for patient referrals.

**E.     The Defendants' Fraudulent and Unlawful Treatment and Billing Protocols**

124.    In the claims identified in Exhibits "1" - "3", the substantial majority of the Insureds whom the Defendants purported to treat did not suffer from any significant injuries or health problems at all as a result of the underlying accidents they experienced.

125.    In keeping with the fact that the substantial majority of the Insureds in the claims identified in Exhibits "1" - "3" were not seriously injured in the underlying accidents, many of the accidents were demonstrably minor.

126.    For example, in many cases, contemporaneous police reports indicated that that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

127.    To the extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain, strain, or similar soft tissue injury diagnosis.

128.    Even so, the Defendants purported to subject many Insureds to a medically unnecessary course of "treatment" that was provided pursuant to pre-determined, fraudulent protocols designed to maximize the billing that the Defendants could submit or cause to be submitted to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

129.    The Defendants purported to provide their pre-determined fraudulent treatment protocols to Insureds without regard for the Insureds' individual symptoms or presentation, or -- in most cases -- the total absence of any serious medical problems arising from any actual automobile accidents.

130.    Each step in the Defendants' fraudulent treatment protocols was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent

step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent PIP billing for each Insured.

131.    No legitimate physician, chiropractor, medical practice, chiropractic practice, ambulatory care facility, or other healthcare provider would permit the fraudulent treatment and billing protocols described below to proceed under his or her auspices.

132.    The Defendants permitted the fraudulent treatment and billing protocols described below to proceed under their auspices because the Defendants sought to profit from the fraudulent billing submitted to GEICO and other insurers.

1.    **The Fraudulent Charges for Initial Examinations at Jersey Premier and Riverside Pain**

133.    As an initial step in their fraudulent scheme, Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu purported to provide virtually every Insured in the claims identified in Exhibits "1" and "2" with initial examinations.

134.    As set forth in Exhibit "1", Mingoia, and various chiropractors associated with Jersey Premier -- including David Beck ("Beck"), Hee Cho ("Cho"), and Jennifer Franz ("Franz") -- purported to perform the vast majority of the initial examinations that were billed to GEICO through Jersey Premier.

135.    Jersey Premier, Mingoia, and Baran then billed the majority of the initial examinations through Jersey Premier to GEICO under CPT Code 99203, typically resulting in a charge of $225.00 per examination.

136.    As set forth in Exhibit "2", Liu purported to perform virtually all of the initial examinations that were billed to GEICO through Riverside Pain.

137.    Riverside Pain and Liu then billed the initial examinations through Riverside Pain to GEICO under CPT code 99203, typically resulting in a charge of $400.00 per examination.

138.    In the claims for initial examinations identified in Exhibits "1" and "2", the charges for the initial examinations were fraudulent in that they misrepresented Jersey Premier and Riverside Pain's eligibility to collect PIP Benefits in the first instance.

139.    In fact, Jersey Premier and Riverside Pain never were eligible to collect PIP Benefits in connection with the claims identified in Exhibits "1" and "2", because -- as a result of the fraudulent and unlawful scheme described herein -- neither they nor the examinations were in compliance with all significant laws and regulations governing healthcare practice in New Jersey.

140.    The charges for the initial examinations also were fraudulent in that they misrepresented the extent, nature, and results of the initial examinations.

a.    **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

141.    In the claims for initial examinations under CPT code 99203 that are identified in Exhibits "1" and "2", Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu routinely misrepresented the severity of the Insureds' presenting problems.

142.    Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99203 to bill for an initial patient examination typically required that the Insured present with problems of moderate severity.

143.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

144.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)    Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)     Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)    Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

145.    Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

146.    By contrast, to the extent that the Insureds in the claims identified in Exhibits "1" and "2" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low or minimal severity soft tissue injuries such as sprains and strains.

147.    Even so, in the claims for initial examinations identified in Exhibits "1" and "2", Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu routinely billed for their putative initial examinations using CPT code 99203 and thereby falsely represented that the Insureds presented with problems of moderate severity.

148.    For example:

(i)     On December 31, 2017, an Insured named JF was involved in an automobile accident. The contemporaneous police report indicated that JF's vehicle was drivable following the accident. The police report further indicated that JF was not injured and did not complain of any pain at the scene. In keeping with the fact that JF was not seriously injured, JF did not visit any hospital emergency room following the accident. To the extent that JF experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so,

following a purported initial examination of JF by Liu on May 24, 2018, Riverside Pain and Liu billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ii)     On December 31, 2017, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that AA was not injured and did not complain of any pain at the scene. Nonetheless, six days later, on January 5, 2018, AA traveled on his own to the Hackensack University Medical Center Emergency Department. The contemporaneous hospital records indicated that AA was briefly observed on an outpatient basis and then discharged with a back pain diagnosis. To the extent that AA experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AA by Franz on February 23, 2018, Jersey Premier, Mingoia, and Baran billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iii)    On February 5, 2018, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to MC's vehicle and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not complain of any pain at the scene. In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of MC by Franz on February 12, 2018, Jersey Premier, Mingoia, and Baran billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(iv)     On February 13, 2018, an Insured named IH was involved in an automobile accident. The contemporaneous police report indicated that IH was not injured and did not complain of any pain at the scene. In keeping with the fact that IH was not seriously injured, IH did not visit any hospital emergency room following the accident. To the extent that IH experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of IH by Franz on February 23, 2018, Jersey Premier, Mingoia, and Baran billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(v)      On July 1, 2018, an Insured named HM was involved in an automobile accident. The contemporaneous police report indicated that HM was not injured and did not complain of any pain at the scene. Nonetheless, two days later, on July 3, 2018, HM traveled on her own to the Hoboken University Medical Center Emergency Department. The contemporaneous hospital records indicated that HM was briefly

observed on an outpatient basis and then discharged with a cervicalgia diagnosis. To the extent that HM experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of HM by Liu on October 16, 2018, Riverside Pain and Liu billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vi)     On November 1, 2018, an Insured named HM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to HM's vehicle, and that HM's vehicle was drivable following the accident. The police report further indicated that HM was not injured and did not complain of any pain at the scene. In keeping with the fact that HM was not seriously injured, HM did not visit any hospital emergency room following the accident. To the extent that HM experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of HM by Liu on November 13, 2018, Riverside Pain and Liu billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(vii)    On November 28, 2018, an Insured named VM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to VM's vehicle and that VM's vehicle was drivable following the accident. The police report further indicated that VM was not injured and did not complain of any pain at the scene. Nonetheless, the next day, on November 29, 2018, VM traveled on his own to the Hackensack University Medical Center Emergency Department. The contemporaneous hospital records indicated that VM was briefly observed on an outpatient basis and then discharged with a back strain diagnosis. To the extent that VM experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of VM by Liu on April 3, 2019, Riverside Pain and Liu billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(viii)   On July 5, 2019, an Insured named HE was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to HE's vehicle and that Hendrick Estevez's vehicle was drivable following the accident. The police report further indicated that HE was not injured and did not complain of any pain at the scene. In keeping with the fact that HE was not seriously injured, HE did not visit any hospital emergency room following the accident. To the extent that HE experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of HE by Liu on September 18, 2019, Riverside Pain and Liu billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(ix)     On July 5, 2019, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AM's vehicle and that Hendrick Estevez's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain at the scene. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of AM by Liu on September 18, 2019, Riverside Pain and Liu billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(x)      On July 5, 2019, an Insured named TT was involved in an automobile accident. The contemporaneous police report indicated that TT's vehicle was drivable following the accident. The police report further indicated that TT was not injured and did not complain of any pain at the scene. In keeping with the fact that TT was not seriously injured, TT did not visit any hospital emergency room following the accident. To the extent that TT experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of TT by Cho on August 1, 2019, Jersey Premier, Mingoia, and Baran billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xi)     On August 2, 2019, an Insured named KA was involved in an automobile accident. The contemporaneous police report indicated that KA' vehicles was drivable following the accident. The police report further indicated that KA was not injured and did not complain of any pain at the scene. In keeping with the fact that KA was not seriously injured, KA did not visit any hospital emergency room following the accident. To the extent that KA experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of KA by Cho on August 8, 2019, Jersey Premier, Mingoia, and Baran billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xii)    On October 24, 2019, an Insured named was involved in an automobile accident. The contemporaneous police report indicated that SA was not injured and did not complain of any pain at the scene. In keeping with the fact that SA was not seriously injured, SA did not visit any hospital emergency room following the accident. To the extent that SA experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of SA by Liu on June 9, 2020, Riverside Pain and Liu billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xiii)  On October 31, 2019, an Insured named TD was involved in an automobile accident. The contemporaneous police report indicated that TD' vehicles was drivable following the accident. The police report further indicated that TD was not injured and did not complain of any pain at the scene. To the extent that TD experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of TD by Franz on November 13, 2019, Jersey Premier, Mingoia, and Baran billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xiv)  On December 26, 2019, an Insured named NV was involved in an automobile accident. The contemporaneous police report indicated that NV was not injured and did not complain of any pain at the scene. In keeping with the fact that NV was not seriously injured, NV did not visit any hospital emergency room following the accident. To the extent that NV experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of NV by Liu on July 29, 2020, Riverside Pain and Liu billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

(xv)  On February 14, 2020, an Insured named HA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to HA's vehicle and that HA's vehicle was drivable following the accident. The police report further indicated that HA was not injured and did not complain of any pain at the scene. In keeping with the fact that HA was not seriously injured, HA did not visit any hospital emergency room following the accident. To the extent that HA experienced any health problems at all as the result of the accident, they were of low or minimal severity. Even so, following a purported initial examination of HA by Liu on October 20, 2020, Riverside Pain and Liu billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that the initial examination involved presenting problems of moderate severity.

149.  These are only representative examples.  In the claims for initial examinations identified in Exhibits "1" and "2", Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu routinely falsely represented that the Insureds presented with problems of moderate severity when in fact the Insureds' problems were low or minimal severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all at the time of the putative examinations.

150.    In the claims for initial examinations identified in Exhibits "1" and "2", Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for their charges for examinations under CPT code 99203 because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations involving presenting problems of low severity, minimal severity, or no severity.

151.    In the claims for initial examinations identified in Exhibits "1" and "2" Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu also routinely falsely represented that the Insureds presented with problems of moderate severity in order to create a false basis for the other Fraudulent Services the Defendants purported to provide to the Insureds.

**b.    Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

152.    What is more, in the claims identified in Exhibits "1" and "2" for initial examinations under CPT code 99203, the Defendants misrepresented and exaggerated the amount of face-to-face time that the examining chiropractor or physician -- typically Mingoia and Liu -- spent with the Insureds or the Insureds' families.

153.    Pursuant to the Fee Schedule, the use of CPT code 99203 to bill for an initial examination represents that the physician or chiropractor who performed the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

154.    As set forth in Exhibits "1" and "2", Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu submitted the majority of their billing for initial examinations under CPT code 99203, and thereby represented that the physician or chiropractors who purported to perform the initial examinations spent at least 30 minutes of face-to-face time with the Insureds or the Insureds' families during the putative examinations.

155.    In fact, in the claims for initial examinations identified in Exhibits "1" and "2", neither Mingoia, Liu, nor any other physician or chiropractor associated with Jersey Premier or Riverside Pain, ever spent 30 minutes of face-to-face time with the Insureds or their families when conducting the examinations.

156.    Rather, in the claims for initial examinations identified in Exhibits "1" and "2", the initial examinations did not entail more than 10-15 minutes of face-to-face time between the examining physicians or chiropractors and the Insureds or their families, to the extent that the examinations actually were performed in the first instance.

157.    For instance, and in keeping with the fact that the initial examinations allegedly provided through Jersey Premier or Riverside Pain did not entail more than 10-15 minutes of face-to-face time with the Insureds or their families, Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu used template forms in purporting to conduct the initial examinations.

158.    The template forms that Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu used in purporting to conduct the initial examinations set forth a very limited range of examination parameters.

159.    The only face-to-face time between the examining physicians or chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

160.    These brief interviews and limited examinations did not require Mingoia, Liu, or any other physicians or chiropractors associated with Jersey Premier or Riverside Pain, to spend more than 10-15  minutes of face-to-face time with the Insureds or their families.

161.    In the claims for initial examinations identified in Exhibits "1" and "2", Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu routinely falsely represented that the

examinations and consultations involved 30 minutes of face-to-face time with the Insureds or their families in order to create a false basis for their charges under CPT code 99203 because examinations billable under CPT code 99203 are reimbursable at a higher rate than examinations that require less time to perform.

**c.   Misrepresentations Regarding the Performance of "Detailed" Physical Examinations**

162.   Moreover, in the claims identified in Exhibits "1" and "2" for initial examinations under CPT code 99203, Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu falsely represented the extent of the underlying physical examinations.

163.   Pursuant to the Fee Schedule, at all relevant times the use of CPT code 99203 to bill for a patient examination represented that the chiropractor or physician who performed the examination conducted a "detailed" physical examination.

164.   Pursuant to the CPT Assistant, a "detailed" physical examination requires -- among other things -- that the physician conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

165.   To the extent that the Insureds in the claims identified in Exhibits "1" and "2" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to musculoskeletal complaints.

166.   Pursuant to the CPT Assistant, in the context of patient examinations, a physician has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

    (i)      measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

    (ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)     examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)      brief assessment of mental status;

(vi)     examination of gait and station;

(vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)   coordination;

(ix)     examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)      examination of sensation.

167.    In the claims for initial examinations identified in Exhibits "1" and "2", when Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu billed for the initial examinations under CPT code 99203, they falsely represented that the physician or chiropractors who performed the examinations performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

168.    In fact, with respect to the claims for initial examinations under CPT code 99203 that are identified in Exhibits "1" and "2", neither Mingoia, Liu nor any other healthcare provider associated with Jersey Premier or Riverside Pain, ever conducted an extended examination of the Insureds' musculoskeletal systems or any of the Insureds' other systems.

169.    For instance, in each of the claims under CPT code 99203 identified in Exhibits "1" and "2", neither Mingoia, Liu, nor any other physician associated with Jersey Premier or Riverside Pain ever conducted an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)      measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)     examination of sensation.

170.    For example:

(i)      On or about February 12, 2018, Jersey Premier, Mingoia, and Baran billed GEICO under CPT code 99203 for an initial examination that Franz purported to perform on an Insured named MC, and thereby represented that they had provided a "detailed" physical examination to MC. However, Franz did not document an extended examination of MC's musculoskeletal system, despite the fact that -- to the extent MC had any complaints at all as the result of the automobile accident -- they were limited to musculoskeletal complaints.

(ii)     On or about February 23, 2018, Jersey Premier, Mingoia, and Baran billed GEICO under CPT code 99203 for an initial examination that Franz purported to perform on an Insured named AA, and thereby represented that they had provided a "detailed" physical examination to AA. However, Franz did not document an extended examination of AA' musculoskeletal system, despite the fact that -- to the extent AA had any complaints at all as the result of the automobile accident -- they were limited to musculoskeletal complaints.

(iii)    On or about May 24, 2018, Riverside Pain and Liu billed GEICO under CPT code 99203 for an initial examination that Liu purported to perform on an Insured named

JF, and thereby represented that they had provided a "detailed" physical examination to JF. However, Liu did not document an extended examination of JF's musculoskeletal system, despite the fact that -- to the extent JF had any complaints at all as the result of the automobile accident -- they were limited to musculoskeletal complaints.

(iv)  On or about October 16, 2018, Riverside Pain and Liu billed GEICO under CPT code 99203 for an initial examination that Liu purported to perform on an Insured named HM, and thereby represented that they had provided a "detailed" physical examination to HM. However, Liu did not document an extended examination of HM's musculoskeletal system, despite the fact that -- to the extent HM had any complaints at all as the result of the automobile accident -- they were limited to musculoskeletal complaints.

(v)   On or about April 3, 2019, Riverside Pain and Liu billed GEICO under CPT code 99203 for an initial examination that Liu purported to perform on an Insured named VM, and thereby represented that they had provided a "detailed" physical examination to VM. However, Liu did not document an extended examination of VM's musculoskeletal system, despite the fact that -- to the extent VM had any complaints at all as the result of the automobile accident -- they were limited to musculoskeletal complaints.

(vi)  On or about July 5, 2019, Jersey Premier, Mingoia, and Baran billed GEICO under CPT code 99203 for an initial examination that Cho purported to perform on an Insured named TT, and thereby represented that they had provided a "detailed" physical examination to TT. However, Cho did not document an extended examination of TT's musculoskeletal system, despite the fact that -- to the extent TT had any complaints at all as the result of the automobile accident -- they were limited to musculoskeletal complaints.

(vii) On or about August 8, 2019, Jersey Premier, Mingoia, and Baran billed GEICO under CPT code 99203 for an initial examination that Cho purported to perform on an Insured named KA, and thereby represented that they had provided a "detailed" physical examination to KA. However, Cho did not document an extended examination of KA's musculoskeletal system, despite the fact that -- to the extent KA had any complaints at all as the result of the automobile accident -- they were limited to musculoskeletal complaints.

(viii) On or about September 18, 2019, Riverside Pain and Liu billed GEICO under CPT code 99203 for an initial examination that Liu purported to perform on an Insured named HE, and thereby represented that they had provided a "detailed" physical examination to HE. However, Liu did not document an extended examination of HE's musculoskeletal system, despite the fact that -- to the extent HE had any complaints at all as the result of the automobile accident -- they were limited to musculoskeletal complaints.

(ix)    On or about November 13, 2019, Jersey Premier, Mingoia, and Baran billed GEICO under CPT code 99203 for an initial examination that Franz purported to perform on an Insured named TD, and thereby represented that they had provided a "detailed" physical examination to TD. However, Franz did not document an extended examination of TD's musculoskeletal system, despite the fact that -- to the extent TD had any complaints at all as the result of the automobile accident -- they were limited to musculoskeletal complaints.

(x)    On or about October 20, 2020, Riverside Pain and Liu billed GEICO under CPT code 99203 for an initial examination that Liu purported to perform on an Insured named HA, and thereby represented that they had provided a "detailed" physical examination to HA. However, Liu did not document an extended examination of HA's musculoskeletal system, despite the fact that -- to the extent HA had any complaints at all as the result of the automobile accident -- they were limited to musculoskeletal complaints.

171.    These are only representative examples.  In all of the claims for initial examinations under CPT code 99203 that are identified in Exhibits "1" and "2", Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu falsely represented that they had provided "detailed" physical examinations, when in fact they had not.

172.    In all of the claims for initial examinations under CPT code 99203 that are identified in Exhibits "1" and "2", Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203 because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining physician or chiropractor to provide "detailed" physical examinations.

**d.    Misrepresentations Regarding the Extent of Medical Decision-Making**

173.    Pursuant to the Fee Schedule, the use of CPT code 99203 to bill for a patient examination represents that the physician or chiropractor who performed the examination engaged in legitimate "low complexity" medical decision-making.

174.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

175.    Though Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu billed for their putative examinations using CPT code 99203, and thereby falsely represented that the examinations involved "low complexity" medical decision-making, in fact the examinations did not involve any legitimate medical decision-making at all.

176.    First, in the claims for initial examinations identified in Exhibits "1" and "2", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

177.    When the Insureds in the claims identified in Exhibits "1" and "2" presented to Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu for "treatment", they typically did not arrive with any medical records except, at times, basic radiology reports.

178.    Furthermore, prior to the initial examinations, Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu typically neither requested any medical records from any other healthcare providers, nor conducted any diagnostic tests.

179.    Second, in Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu's claims for initial examinations identified in Exhibits "1" and "2", there was no risk of significant complications or morbidity -- much less mortality -- from the Insureds' minor soft-tissue injury

complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

180.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu, to the extent that Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu provided any such diagnostic procedures or treatment options in the first instance.

181.    In almost every instance, any diagnostic procedures and "treatments" that Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu actually typically provided were limited to a series of medically unnecessary follow-up examinations, pain management injections, and chiropractic and physical therapy services, none of which was health--or life--threatening if properly administered.

182.    Third, in Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu's claims for initial examinations identified in Exhibits "1" and "2", Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu did not consider any significant number of diagnoses or treatment options for Insureds during the initial examinations.

183.    Rather, to the extent that the initial examinations were conducted in the first instance, Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu provided substantially similar, pre-determined "diagnoses" for every Insured, and prescribed a substantially similar course of treatment for every Insured.

184.    Specifically, in almost every instance in the claims identified in Exhibits "1" and "2", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

185.     Even so, Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu prepared initial examination reports in which they provided substantially similar, phony, objectively unverifiable soft tissue injury "diagnoses" to virtually every Insured.

186.     Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu issued these phony "diagnoses" to create a false basis for the Fraudulent Services.

187.     For example:

(i)      On December 31, 2017, an Insured named JF was involved in an automobile accident. The contemporaneous police report indicated that JF's vehicle was drivable following the accident. The police report further indicated that JF was not injured and did not complain of any pain at the scene. In keeping with the fact that JF was not seriously injured, JF did not visit any hospital emergency room following the accident. To the extent that JF experienced any health problems at all as the result of the accident, they were of low or minimal severity. On May 24, 2018, Liu purported to perform an initial examination of JF. Liu did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Liu did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Liu provided JF with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither JF's presenting problems, nor the treatment plan provided to JF by Riverside Pain and Liu, presented any risk of significant complications, morbidity, or mortality. To the contrary, JF did not need any extensive treatment at all as a result of the accident, and the treatment plan provided, if properly performed, did not pose the least bit of risk to JF. Even so, Riverside Pain and Liu billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Liu engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ii)     On December 31, 2017, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that AA was not injured and did not complain of any pain at the scene. Nonetheless, six days later, on January 5, 2018, AA traveled on his own to the Hackensack University Medical Center Emergency Department. The contemporaneous hospital records indicated that AA was briefly observed on an outpatient basis and then discharged with a back pain diagnosis. To the extent that AA experienced any health problems at all as the result of the accident, they were of low or minimal severity. On February 23, 2018, Franz purported to perform an initial examination of AA. Franz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Franz did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Franz provided AA with substantially the same, phony soft

tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AA' presenting problems, nor the treatment plan provided to AA by Jersey Premier and Franz, presented any risk of significant complications, morbidity, or mortality. To the contrary, AA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Jersey Premier and Franz consisted of medically unnecessary follow-up examinations, physical therapy and chiropractic services, none of which, if properly performed, posed the least bit of risk to AA. Even so, Jersey Premier, Mingoia, and Baran billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Franz engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iii)    On February 5, 2018, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to MC's vehicle and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not complain of any pain at the scene. In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as the result of the accident, they were of low or minimal severity. On February 12, 2018, Franz purported to perform an initial examination of MC. Franz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Franz did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Franz provided MC with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MC's presenting problems, nor the treatment plan provided to MC by Jersey Premier and Franz, presented any risk of significant complications, morbidity, or mortality. To the contrary, MC did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Jersey Premier and Franz consisted of medically unnecessary follow-up examinations, physical therapy and chiropractic services, none of which, if properly performed, posed the least bit of risk to MC. Even so, Jersey Premier, Mingoia, and Baran billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Franz engaged in some legitimate, low complexity medical decision-making during the purported examination.

(iv)    On February 13, 2018, an Insured named IH was involved in an automobile accident. The contemporaneous police report indicated that IH was not injured and did not complain of any pain at the scene. In keeping with the fact that IH was not seriously injured, IH did not visit any hospital emergency room following the accident. To the extent that IH experienced any health problems at all as the result of the accident, they were of low or minimal severity. On February 23, 2018, Franz purported to perform an initial examination of IH. Franz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Franz did not consider any significant number of diagnoses or management options in connection with the

examination. Instead, Franz provided IH with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither IH's presenting problems, nor the treatment plan provided to IH by Jersey Premier and Franz, presented any risk of significant complications, morbidity, or mortality. To the contrary, IH did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Jersey Premier and Franz consisted of medically unnecessary follow-up examinations, physical therapy and chiropractic services, none of which, if properly performed, posed the least bit of risk to IH. Even so, Jersey Premier, Mingoia, and Baran billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Franz engaged in some legitimate, low complexity medical decision-making during the purported examination.

(v)     On July 1, 2018, an Insured named HM was involved in an automobile accident. The contemporaneous police report indicated that HM was not injured and did not complain of any pain at the scene. Nonetheless, two days later, on July 3, 2018, HM traveled on her own to the Hoboken University Medical Center Emergency Department. The contemporaneous hospital records indicated that HM was briefly observed on an outpatient basis and then discharged with a cervicalgia diagnosis. To the extent that HM experienced any health problems at all as the result of the accident, they were of low or minimal severity. On October 16, 2018, Liu purported to perform an initial examination of HM. Liu did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Liu did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Liu provided HM with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither HM's presenting problems, nor the treatment plan provided to HM by Riverside Pain and Liu, presented any risk of significant complications, morbidity, or mortality. To the contrary, HM did not need any extensive treatment at all as a result of the accident, and the treatment plan provided, if properly performed, did not pose the least bit of risk to HM. Even so, Riverside Pain and Liu billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Liu engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vi)    On November 1, 2018, an Insured named HM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to HM's vehicle, and that HM's vehicle was drivable following the accident. The police report further indicated that HM was not injured and did not complain of any pain at the scene. In keeping with the fact that HM was not seriously injured, HM did not visit any hospital emergency room following the accident. To the extent that HM experienced any health problems at all as the result of the accident, they were of low or minimal severity. On November 13, 2018, Liu purported to perform an initial examination of HM. Liu did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Liu did not consider

any significant number of diagnoses or management options in connection with the examination. Instead, Liu provided HM with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither HM's presenting problems, nor the treatment plan provided to HM by Riverside Pain and Liu, presented any risk of significant complications, morbidity, or mortality. To the contrary, HM did not need any extensive treatment at all as a result of the accident. Even so, Riverside Pain and Liu billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Liu engaged in some legitimate, low complexity medical decision-making during the purported examination.

(vii)   On November 28, 2018, an Insured named VM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to VM's vehicle and that VM's vehicle was drivable following the accident. The police report further indicated that VM was not injured and did not complain of any pain at the scene. Nonetheless, the next day, on November 29, 2018, VM traveled on his own to the Hackensack University Medical Center Emergency Department. The contemporaneous hospital records indicated that VM was briefly observed on an outpatient basis and then discharged with a back strain diagnosis. To the extent that VM experienced any health problems at all as the result of the accident, they were of low or minimal severity. On April 3, 2019, Liu purported to perform an initial examination of VM. Liu did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Liu did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Liu provided VM with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither VM's presenting problems, nor the treatment plan provided to VM by Riverside Pain and Liu, presented any risk of significant complications, morbidity, or mortality. To the contrary, VM did not need any extensive treatment at all as a result of the accident. Even so, Riverside Pain and Liu billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Liu engaged in some legitimate, low complexity medical decision-making during the purported examination.

(viii)  On July 5, 2019, an Insured named HE was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to HE's vehicle and that Hendrick Estevez's vehicle was drivable following the accident. The police report further indicated that HE was not injured and did not complain of any pain at the scene. In keeping with the fact that HE was not seriously injured, HE did not visit any hospital emergency room following the accident. To the extent that HE experienced any health problems at all as the result of the accident, they were of low or minimal severity. On September 18, 2019, Liu purported to perform an initial examination of HE. Liu did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Liu did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Liu

provided HE with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither HE's presenting problems, nor the treatment plan provided to HE by Riverside Pain and Liu, presented any risk of significant complications, morbidity, or mortality. To the contrary, HE did not need any extensive treatment at all as a result of the accident. Even so, Riverside Pain and Liu billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Liu engaged in some legitimate, low complexity medical decision-making during the purported examination.

(ix)    On July 5, 2019, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AM's vehicle and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain at the scene. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as the result of the accident, they were of low or minimal severity. On September 18, 2019, Liu purported to perform an initial examination of AM. Liu did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Liu did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Liu provided AM with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AM's presenting problems, nor the treatment plan provided to AM by Riverside Pain and Liu, presented any risk of significant complications, morbidity, or mortality. To the contrary, AM did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Riverside Pain and Liu consisted of medically unnecessary physical therapy and pain management injections, none of which, if properly performed, posed the least bit of risk to AM. Even so, Riverside Pain and Liu billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Liu engaged in some legitimate, low complexity medical decision-making during the purported examination.

(x)    On July 5, 2019, an Insured named TT was involved in an automobile accident. The contemporaneous police report indicated that TT's vehicle was drivable following the accident. The police report further indicated that TT was not injured and did not complain of any pain at the scene. In keeping with the fact that TT was not seriously injured, TT did not visit any hospital emergency room following the accident. To the extent that TT experienced any health problems at all as the result of the accident, they were of low or minimal severity. On August 1, 2019, Cho purported to perform an initial examination of TT. Cho did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Cho did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Cho provided TT with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither

TT's presenting problems, nor the treatment plan provided to TT by Jersey Premier and Cho, presented any risk of significant complications, morbidity, or mortality. To the contrary, TT did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Jersey Premier and Cho consisted of medically unnecessary follow-up examinations, physical therapy and chiropractic, none of which, if properly performed, posed the least bit of risk to TT. Even so, Jersey Premier, Mingoia, and Baran billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Cho engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xi)     On August 2, 2019, an Insured named KA was involved in an automobile accident. The contemporaneous police report indicated that KA' vehicles was drivable following the accident. The police report further indicated that KA was not injured and did not complain of any pain at the scene. In keeping with the fact that KA was not seriously injured, KA did not visit any hospital emergency room following the accident. To the extent that KA experienced any health problems at all as the result of the accident, they were of low or minimal severity. On August 8, 2019, Franz purported to perform an initial examination of KA. Franz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Franz did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Franz provided KA with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither KA's presenting problems, nor the treatment plan provided to KA by Jersey Premier and Franz, presented any risk of significant complications, morbidity, or mortality. To the contrary, KA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Jersey Premier and Franz consisted of medically unnecessary follow-up examinations, physical therapy and chiropractic services , none of which, if properly performed, posed the least bit of risk to KA. Even so, Jersey Premier, Mingoia, and Baran billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Franz engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xii)     On October 24, 2019, an Insured named SA was involved in an automobile accident. The contemporaneous police report indicated that SA was not injured and did not complain of any pain at the scene. In keeping with the fact that SA was not seriously injured, SA did not visit any hospital emergency room following the accident. To the extent that SA experienced any health problems at all as the result of the accident, they were of low or minimal severity. On June 9, 2020, Liu purported to perform an initial examination of SA. Liu did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Liu did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Liu provided SA with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured.

Furthermore, neither SA's presenting problems, nor the treatment plan provided to SA by Riverside Pain and Liu, presented any risk of significant complications, morbidity, or mortality. To the contrary, SA did not need any extensive treatment at all as a result of the accident. Even so, Riverside Pain and Liu billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Liu engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiii)   On October 31, 2019, an Insured named TD was involved in an automobile accident. The contemporaneous police report indicated that TD' vehicles was drivable following the accident. The police report further indicated that TD was not injured and did not complain of any pain at the scene. To the extent that TD experienced any health problems at all as the result of the accident, they were of low or minimal severity. On November 13, 2019, Franz purported to perform an initial examination of TD. Franz did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Franz did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Franz provided TD with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither TD's presenting problems, nor the treatment plan provided to TD by Jersey Premier and Franz, presented any risk of significant complications, morbidity, or mortality. To the contrary, TD did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Jersey Premier and Franz consisted of medically unnecessary follow-up examinations, physical therapy and chiropractic services, none of which, if properly performed, posed the least bit of risk to TD. Even so, Jersey Premier, Mingoia, and Baran billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Franz engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xiv)   On December 26, 2019, an Insured named NV was involved in an automobile accident. The contemporaneous police report indicated that NV was not injured and did not complain of any pain at the scene. In keeping with the fact that NV was not seriously injured, NV did not visit any hospital emergency room following the accident. To the extent that NV experienced any health problems at all as the result of the accident, they were of low or minimal severity. On July 29, 2020, Liu purported to perform an initial examination of NV. Liu did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Liu did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Liu provided NV with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither NV's presenting problems, nor the treatment plan provided to NV by Riverside Pain and Liu, presented any risk of significant complications, morbidity, or mortality. To the contrary, NV did not need any extensive treatment at all as a result of the accident. Even so, Riverside Pain and Liu billed GEICO for

the initial examination using CPT code 99203, and thereby falsely represented that Liu engaged in some legitimate, low complexity medical decision-making during the purported examination.

(xv)   On February 14, 2020, an Insured named HA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to HA's vehicle and that HA's vehicle was drivable following the accident. The police report further indicated that HA was not injured and did not complain of any pain at the scene. In keeping with the fact that HA was not seriously injured, HA did not visit any hospital emergency room following the accident. To the extent that HA experienced any health problems at all as the result of the accident, they were of low or minimal severity. On October 20, 2020, Liu purported to perform an initial examination of HA. Liu did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the examination. Moreover, Liu did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Liu provided HA with substantially the same, phony soft tissue injury "diagnoses" that he provided to virtually every other Insured. Furthermore, neither HA's presenting problems, nor the treatment plan provided to HA by Riverside Pain and Liu presented any risk of significant complications, morbidity, or mortality. To the contrary, HA did not need any extensive treatment at all as a result of the accident, and the treatment plan provided by Riverside Pain and Liu consisted of medically unnecessary physical therapy and pain management injections, none of which, if properly performed, posed the least bit of risk to HA. Even so, Riverside Pain and Liu billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Liu engaged in some legitimate, low complexity medical decision-making during the purported examination.

188.   There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

189.   An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

190.   As set forth above, in the claims identified in Exhibits "1" and "2", most of the Insureds whom Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu purported to treat were involved in relatively minor accidents.

191.   It is highly improbable that any two Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibits "1" and "2" would suffer

substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

192.   It is even more improbable -- to the point of impossibility -- that this would occur repeatedly, often with the Insureds presenting for initial examinations by Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu with substantially identical injuries <u>on or about the exact same dates</u> after their accidents, oftentimes many weeks or months after their accidents.

193.   Even so, in keeping with the fact that Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu's putative "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu frequently issued substantially identical "diagnoses", on or about the same date, oftentimes many weeks or months after the underlying accidents, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

194.   For example:

(i)   On December 16, 2017, two Insureds -- AA and TA -- were involved in an automobile accident. Thereafter, AA and TA both presented -- incredibly -- on the exact same date, May 24, 2018, to Riverside Pain for initial examinations by Liu. AA and TA were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AA and TA suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Riverside Pain and Liu provided AA and TA with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ii)   On July 17, 2018, two Insureds -- WG and EG -- were involved in an automobile accident. Thereafter, WG and EG both presented -- incredibly -- on the exact same date, August 1, 2018, to Jersey Premier for initial examinations by Franz. WG and EG were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that WG and EG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Jersey Premier, Mingoia, Baran, and Franz provided WG and EG with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

60

(iii)   On July 1, 2018, two Insureds -- ZM and HM -- were involved in an automobile accident. Thereafter, ZM and HM both presented -- incredibly -- on the exact same date, July 31, 2018, to Jersey Premier for initial examinations by Beck. ZM and HM were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that ZM and HM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Jersey Premier, Mingoia, Baran, and Beck provided ZM and HM with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(iv)   On December 8, 2018, three Insureds -- AS, AS, and LG -- were involved in an automobile accident. Thereafter, AS, AS, and LG all presented -- incredibly -- on the exact same date, December 20, 2018, to Jersey Premier for initial examinations by Cho. AS, AS, and LG were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AS, AS, and LG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Jersey Premier, Mingoia, Baran, and Cho provided AS, AS, and LG with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for all of them.

(v)   On January 5, 2019, three Insureds -- PG, MG, and MM -- were involved in an automobile accident. Thereafter, PG, MG, and MM all presented -- incredibly -- on the exact same date, March 11, 2021, to Riverside Pain for initial examinations by Liu. PG, MG, and MM were all different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that PG, MG, and MM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Riverside Pain and Liu provided PG, MG, and MM with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for all of them.

(vi)   On January 5, 2019, three Insureds -- MG, PG, and MM -- were involved in an automobile accident. Thereafter, MG, PG, and MM all presented -- incredibly -- on the exact same date, February 11, 2019, to Jersey Premier for initial examinations by Franz. MG, PG, and MM were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MG, PG, and MM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Jersey Premier, Mingoia, Baran, and Franz provided MG, PG, and MM with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for all of them.

(vii)   On July 5, 2019, two Insureds -- HE and AM -- were involved in an automobile accident. Thereafter, HE and AM both presented -- incredibly -- on the exact same date, September 18, 2019, to Riverside Pain for initial examinations by Liu. HE and AM were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that HE and AM

suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Riverside Pain and Liu provided HE and AM with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(viii)   On September 22, 2019, two Insureds -- BJ and LJ -- were involved in an automobile accident. Thereafter, BJ and LJ both presented -- incredibly -- on the exact same date, December 26, 2019, to Riverside Pain for initial examinations by Liu. BJ and LJ were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that BJ and LJ suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Riverside Pain and Liu provided BJ and LJ with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(ix)   On November 7, 2019, two Insureds -- AP and BP -- were involved in an automobile accident. Thereafter, AP and BP both presented -- incredibly -- on the exact same date, January 22, 2020, to Riverside Pain for initial examinations by Liu. AP and BP were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AP and BP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Riverside Pain and Liu provided AP and BP with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(x)   On September 19, 2020, two Insureds -- EE and HE -- were involved in an automobile accident. Thereafter, EE and HE both presented -- incredibly -- on the exact same date, September 22, 2020, to Riverside Pain for initial examinations by Liu. EE and HE were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that EE and HE suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Riverside Pain and Liu provided EE and HE with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xi)   On November 21, 2020, two Insureds -- RM and AM -- were involved in an automobile accident. Thereafter, RM and AM both presented -- incredibly -- on the exact same date, December 3, 2020, to Riverside Pain for initial examinations by Liu. RM and AM were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that RM and AM suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Riverside Pain and Liu provided RM and AM with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xii)   On February 11, 2021, two Insureds -- RE and XS -- were involved in an automobile accident. Thereafter, RE and XS both presented -- incredibly -- on the

exact same date, May 4, 2021, to Riverside Pain for initial examinations by Liu. RE and XS were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that RE and XS suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Riverside Pain and Liu provided RE and XS with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xiii)   On February 19, 2021, two Insureds -- AC and JC -- were involved in an automobile accident. Thereafter, AC and JC both presented -- incredibly -- on the exact same date, June 15, 2021, to Riverside Pain for initial examinations by Liu. AC and JC were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AC and JC suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Liu provided AC and JC with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xiv)   On June 2, 2021, two Insureds -- BB and MG -- were involved in an automobile accident. Thereafter, BB and MG both presented -- incredibly -- on the exact same date, June 26, 2021, to Jersey Premier for initial examinations by Beck. BB and MG were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that BB and MG suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Jersey Premier, Mingoia, Baran, and Beck provided BB and MG with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

(xv)   On October 8, 2021, two Insureds -- YL and HP -- were involved in an automobile accident. Thereafter, YL and HP both presented -- incredibly -- on the exact same date, October 22, 2021, to Jersey Premier for initial examinations by Beck. YL and HP were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that YL and HP suffered any injuries at all in their accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Jersey Premier, Mingoia, Baran, and Beck provided YL and HP with substantially identical "diagnoses", and recommended a substantially identical course of "treatment" for both of them.

195.   These are only representative examples. In the claims for initial examinations that are identified in Exhibits "1" and "2", Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu frequently issued substantially identical "diagnoses", on or about the same date, oftentimes weeks or months after the underlying accidents, to more than one Insured involved in a single accident,

and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the fact that the Insureds were differently situated.

196.    Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants later purported to provide to the Insureds.

197.    In the claims for initial examinations identified in Exhibits "1" and "2", Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu also routinely falsely represented that the initial examinations involved some legitimate, complex medical decision-making in order to provide a false basis to bill for the initial examinations under CPT code 99203 because examinations billable under CPT code 99203 are reimbursable at a higher rate than examinations that do not require any complex medical decision-making at all.

**2.    The Fraudulent Charges for Follow-Up Examinations at Jersey Premier and Riverside Pain**

198.    In addition to their fraudulent initial examinations, Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu typically purported to subject the Insureds in the claims identified in Exhibits "1" and "2" to multiple fraudulent follow-up examinations during the course of their fraudulent treatment and billing protocols.

199.    As set forth in Exhibit "1", Mingoia, and various providers associated with Jersey Premier -- including Beck, Cho, and Franz -- purported to perform the vast majority of the putative follow-up examinations at Jersey Premier, which were then routinely billed to GEICO under CPT code 99213, typically resulting in a charge of between $130.00 and $160.00 for each purported follow-up examination.

200.    As set forth in Exhibit "2", Liu purported to perform virtually all of the putative follow-up examinations at Riverside Pain, which were then billed to GEICO under CPT code 99213, typically resulting in a charge of $200.00 for each purported follow-up examination.

201.    All of Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu's billing for their purported follow-up examinations was fraudulent because it misrepresented Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu's eligibility to collect PIP Benefits in the first instance.

202.    Moreover, and as set forth below, Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu's charges for the putative follow-up examinations identified in Exhibits "1" and "2" were fraudulent in that they misrepresented the nature, extent, and reimbursability of the examinations.

a.      **Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

203.    Pursuant to the CPT Assistant, at all relevant times the use of CPT code 99213 to bill for a follow-up examination typically required that the patient present with problems of low to moderate severity.

204.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as problems of low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

205.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might qualify as problems of low to moderate severity, and therefore support the use of CPT code 99213 to bill for a follow-up patient examination:

(i)     Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)    Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

65

(iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)     Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

206.    Accordingly, pursuant to the CPT Assistant, even the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some real threat to the patient's health.

207.    By contrast, and as set forth above, to the extent that the Insureds in the claims identified in Exhibits "1" and "2" suffered any injuries at all in their automobile accidents, the injuries were minor soft tissue injuries such as sprains and strains.

208.    Soft tissue injuries virtually always resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to demonstrate why continued treatment is necessary beyond the four-week, eight-week, and 13-week marks.

209.    By the time the Insureds in the claims identified in Exhibits "1" and "2" presented to Jersey Premier and Riverside Pain for putative follow-up examinations, the Insureds either did not have any genuine presenting problems at all as the result of their automobile accidents, or their presenting problems were minimal.

210.    Even so, in the claims for follow-up examinations identified in Exhibit "2", Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu routinely billed for their putative follow-up examinations under CPT code 99213, and thereby falsely represented that the Insureds continued

to suffer from presenting problems of low to moderate severity, despite the fact that the purported examinations were often provided many months after the Insureds' automobile accidents, and long after any attendant soft tissue pain or other symptoms attendant to the automobile accidents would have resolved.

211.  For example:

(i)  On December 31, 2017, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that AA was not injured and did not complain of any pain at the scene. Nonetheless, six days later, on January 5, 2018, AA traveled on his own to the Hackensack University Medical Center Emergency Department. The contemporaneous hospital records indicated that AA was briefly observed on an outpatient basis and then discharged with a back pain diagnosis. To the extent that AA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved or were minimal within two to three months of the accident. Even so, following purported follow-up examination of AA by Franz on May 2, 2018, June 13, 2018, and July 18, 2018 -- between four and six months after the accident -- Jersey Premier, Mingoia, and Baran billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that AA presented with problems of low to moderate severity at each follow-up examination.

(ii)  On February 5, 2018, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to MC's vehicle and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not complain of any pain at the scene. In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved or were minimal within two to three months of the accident. Even so, following purported follow-up examination of MC by Franz on June 6, 2018 -- more than four months after the accident -- Jersey Premier, Mingoia, and Baran billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that MC presented with problems of low to moderate severity at each follow-up examination.

(iii)  On July 1, 2018, an Insured named HM was involved in an automobile accident. The contemporaneous police report indicated that HM was not injured and did not complain of any pain at the scene. Nonetheless, two days later, on July 3, 2018, HM traveled on her own to the Hoboken University Medical Center Emergency Department. The contemporaneous hospital records indicated that HM was briefly observed on an outpatient basis and then discharged with a cervicalgia diagnosis.

To the extent that HM experienced any health problems at all as the result of the accident, they were of low or minimal severity, and had completely resolved or were minimal within two to three months of the accident. Even so, following purported follow-up examinations of HM by Liu on January 24, 2019, February 28, 2019, and August 6, 2019 -- between six and thirteen months after the accident -- Riverside Pain and Liu billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that HM presented with problems of low to moderate severity at each follow-up examination.

(iv)     On July 5, 2019, an Insured named HE was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to HE's vehicle and that Hendrick Estevez's vehicle was drivable following the accident. The police report further indicated that HE was not injured and did not complain of any pain at the scene. In keeping with the fact that HE was not seriously injured, HE did not visit any hospital emergency room following the accident. To the extent that HE experienced any health problems at all as the result of the accident, they were of low or minimal severity, and had completely resolved or were minimal within two to three months of the accident. Even so, following purported follow-up examinations of HE by Liu on November 20, 2019 and February 26, 2019 -- between five and eight months after the accident -- Riverside Pain and Liu billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that HE presented with problems of low to moderate severity at each follow-up examination.

(v)      On July 5, 2019, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AM's vehicle and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain at the scene. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as the result of the accident, they were of low or minimal severity, and had completely resolved or were minimal within two to three months of the accident. Even so, following purported follow-up examinations of AM by Liu on November 20, 2019 and February 26, 2019 -- between five and eight months after the accident -- Riverside Pain and Liu billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that AM presented with problems of low to moderate severity at each follow-up examination.

(vi)     On July 5, 2019, an Insured named TT was involved in an automobile accident. The contemporaneous police report indicated that TT's vehicle was drivable following the accident. The police report further indicated that TT was not injured and did not complain of any pain at the scene. In keeping with the fact that TT was not seriously injured, TT did not visit any hospital emergency room following the accident. To the extent that TT experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved or were minimal within two to three months of the accident. Even so,

following purported follow-up examinations of TT on October 2, 2019, November 12, 2019, December 17, 2019, and January 9, 2020 -- between three and six months after the accident -- Jersey Premier, Mingoia, and Baran billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that TT presented with problems of low to moderate severity at each follow-up examination.

(vii)    On August 2, 2019, an Insured named KA was involved in an automobile accident. The contemporaneous police report indicated that KA' vehicles was drivable following the accident. The police report further indicated that KA was not injured and did not complain of any pain at the scene. In keeping with the fact that KA was not seriously injured, KA did not visit any hospital emergency room following the accident. To the extent that KA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved or were minimal within two to three months of the accident. Even so, following a purported follow-up examination of KA by Franz on November 25, 2019 -- more than three month after the accident -- Jersey Premier, Mingoia, and Baran billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that KA presented with problems of low to moderate severity at the follow-up examination.

(viii)   On October 24, 2019, an Insured named SA was involved in an automobile accident. The contemporaneous police report indicated that SA was not injured and did not complain of any pain at the scene. In keeping with the fact that SA was not seriously injured, SA did not visit any hospital emergency room following the accident. To the extent that SA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved or were minimal within two to three months of the accident. Even so, following a purported follow-up examination of SA by Liu on July 9, 2020 -- more than eight months after the accident -- Riverside Pain and Liu billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that SA presented with problems of low to moderate severity at each follow-up examination.

(ix)     On October 31, 2019, an Insured named TD was involved in an automobile accident. The contemporaneous police report indicated that TD' vehicles was drivable following the accident. The police report further indicated that TD was not injured and did not complain of any pain at the scene. To the extent that TD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved or were minimal within two to three months of the accident. Even so, following purported follow-up examination of TD by Ma on May 13, 2020, June 24, 2020, July 28, 2020, and August 24, 2020 -- between six and nine months after the accident -- Jersey Premier, Mingoia, and Baran billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that TD presented with problems of low to moderate severity at each follow-up examination.

(x)     On December 26, 2019, an Insured named NV was involved in an automobile accident. The contemporaneous police report indicated that NV was not injured and did not complain of any pain at the scene. In keeping with the fact that NV was not seriously injured, NV did not visit any hospital emergency room following the accident. To the extent that NV experienced any health problems at all as the result of the accident, they were of low or minimal severity, and had completely resolved or were minimal within two to three months of the accident. Even so, following purported follow-up examinations of NV by Liu on August 18, 2020 and December 1, 2020 -- between eight and eleven months after the accident -- Riverside Pain and Liu billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that NV presented with problems of low to moderate severity at each follow-up examination.

212.    These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" and "2", Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu routinely falsely represented that the Insureds presented with problems of low to moderate severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations -- which often were many months after the minor accidents -- or else their presenting problems were minimal.

213.    In the claims for follow-up examinations identified in Exhibits "1" and "2", Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to create a false basis for their charges for the putative examinations under CPT code 99213, because examinations billable under CPT code 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

214.    In the claims for follow-up examinations identified in Exhibits "1" and "2", Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu also routinely falsely represented that the Insureds presented with problems of low to moderate severity in order to create a false basis for

the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

**b.      Misrepresentations Regarding the Amount of Time Spent on the Follow-Up Examinations**

215.    What is more, in the claims for follow-up examinations identified in Exhibits "1" and "2" that were billed under CPT code 99213, Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu misrepresented the amount of time that was spent on the follow-up examinations.

216.    Pursuant to the Fee Schedule, at all relevant times the use of CPT code 99213 to bill for a follow-up examination typically represented that the physician or chiropractor who performed the examination spent at least 15 minutes of face-to-face time with the patient or the patient's family.

217.    However, in the claims for follow-up examinations identified in Exhibits "1" and "2", neither Mingoia, Liu, nor any other healthcare provider associated with Jersey Premier or Riverside Pain, ever spent 15 minutes of face-to-face time with the Insureds or their families when conducting the examinations.

218.    Rather, in the claims for follow-up examinations identified in Exhibit "1", the follow-up examinations did not entail more than 5-10 minutes of face-to-face time between the examining physicians and the Insureds or their families, to the extent that the examinations actually were performed in the first instance.

219.    For instance, and in keeping with the fact that the follow-up examinations allegedly provided through Jersey Premier and Riverside Pain did not entail more than 5-10 minutes of face-to-face time with the Insureds or their families, Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu frequently used template forms in purporting to conduct the follow-up examinations.

220.    The templates that the Defendants used in purporting to conduct the follow-up examinations set forth a very limited range of examination parameters.

221.    The only face-to-face time between the examining physicians or chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and very brief examinations of the Insureds' musculoskeletal systems.

222.    These brief interviews and examinations did not require any healthcare provider associated with Jersey Premier or Riverside Pain to spend more than 5-10 minutes of face-to-face time with the Insureds or their families.

223.    In the claims for follow-up examinations identified in Exhibits  "1" and "2", Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu falsely represented that the examinations involved at least 15 minutes of face-to-face time with the Insureds or their families because examinations billable under CPT code 99213 are reimbursable at a higher rate than examinations that require less time to perform.

**c.      Misrepresentations Regarding the Results of the Follow-Up Examinations**

224.    Moreover, pursuant to the Fee Schedule, when Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu submitted charges for the follow-up examinations under CPT code 99213, they represented that they performed at least two of the following three components:  (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

225.    In actuality, however, in the claims for follow-up examinations identified in Exhibits "1" and "2", Jersey Premier, Mingoia, Baran, Riverside Pain, Liu, and their associates did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

226.    Rather, following their purported follow-up examinations, Jersey Premier, Mingoia, Baran, Riverside Pain, Liu, and their associates simply reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations and recommended that the Insureds continue to return to Jersey Premier and Riverside Pain for additional medically unnecessary follow-up examinations, pain management injections, chiropractic treatments, and/or physical therapy treatments.

227.    In keeping with the fact that the putative "results" of the follow-up examinations were phony, and were falsified to support continued, medically unnecessary treatments and procedures by the Defendants, and to provide a false justification for the medically unnecessary tests and treatments that the Defendants already had purported to provide, Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu routinely falsely purported to diagnose continuing effects of soft tissue injuries in the Insureds long after the minor underlying automobile accidents occurred, and long after any attendant soft tissue injury pain or other symptoms attendant to the minor automobile accidents would have resolved.

228.    For example:

(i)     On February 5, 2018, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to MC's vehicle and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not complain of any pain at the scene. In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of MC by Franz on June 6, 2018 -- more than four months after the accident -- Franz falsely reported that MC continued to suffer from significant levels of pain as the result of the minor, four month-old accident, and recommended that MC return to Jersey Premier for the continued provision of the Fraudulent Services.

(ii)    On July 1, 2018, an Insured named HM was involved in an automobile accident. The contemporaneous police report indicated that HM was not injured and did not

complain of any pain at the scene. Nonetheless, two days later, on July 3, 2018, HM traveled on her own to the Hoboken University Medical Center Emergency Department. The contemporaneous hospital records indicated that HM was briefly observed on an outpatient basis and then discharged with a cervicalgia diagnosis. To the extent that HM experienced any health problems at all as the result of the accident, they were of low or minimal severity, and had completely resolved or were minimal within two to three months of the accident. Even so, following a purported follow-up examination of HM by Liu on January 24, 2019 -- more than six months after the accident -- Liu falsely reported that HM continued to suffer from significant levels of pain as the result of the minor, six month-old accident, and recommended that HM return to Riverside Pain for the continued provision of the Fraudulent Services.

(iii)   On July 5, 2019, an Insured named AM was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to AM's vehicle and that AM's vehicle was drivable following the accident. The police report further indicated that AM was not injured and did not complain of any pain at the scene. In keeping with the fact that AM was not seriously injured, AM did not visit any hospital emergency room following the accident. To the extent that AM experienced any health problems at all as the result of the accident, they were of low or minimal severity, and had completely resolved or were minimal within two to three months of the accident. Even so, following a purported follow-up examination of AM by Liu on February 26, 2020 -- more than seven months after the accident -- Liu falsely reported that AM continued to suffer from significant levels of pain as the result of the minor, seven month-old accident, and recommended that AM return to Riverside Pain for the continued provision of the Fraudulent Services.

(iv)   On July 5, 2019, an Insured named TT was involved in an automobile accident. The contemporaneous police report indicated that TT's vehicle was drivable following the accident. The police report further indicated that TT was not injured and did not complain of any pain at the scene. In keeping with the fact that TT was not seriously injured, TT did not visit any hospital emergency room following the accident. To the extent that TT experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of TT by Ma on December 17, 2019 -- more than five months after the accident -- Ma falsely reported that TT continued to suffer from significant levels of pain as the result of the minor, five month-old accident, and recommended that TT return to Jersey Premier for the continued provision of the Fraudulent Services.

(v)   On August 2, 2019, an Insured named KA was involved in an automobile accident. The contemporaneous police report indicated that KA' vehicles was drivable following the accident. The police report further indicated that KA was not injured and did not complain of any pain at the scene. In keeping with the fact that KA was not seriously injured, KA did not visit any hospital emergency room following the accident. To the extent that KA experienced any health problems at all as the result

of the accident, they were of low or minimal severity at the outset at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of KA by Franz on November 15, 2019 -- more than three months after the accident -- Franz falsely reported that KA continued to suffer from significant levels of pain as the result of the minor, three month-old accident, and recommended that KA return to Jersey Premier for the continued provision of the Fraudulent Services.

(vi)     On October 24, 2019, an Insured named SA was involved in an automobile accident. The contemporaneous police report indicated that SA was not injured and did not complain of any pain at the scene. In keeping with the fact that SA was not seriously injured, SA did not visit any hospital emergency room following the accident. To the extent that SA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of SA by Liu on July 9, 2020 -- more than eight months after the accident -- Liu falsely reported that SA continued to suffer from significant levels of pain as the result of the minor, eight month-old accident, and recommended that SA return to Riverside Pain for the continued provision of the Fraudulent Services.

(vii)    On October 31, 2019, an Insured named TD was involved in an automobile accident. The contemporaneous police report indicated that TD' vehicles was drivable following the accident. The police report further indicated that TD was not injured and did not complain of any pain at the scene. To the extent that TD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset at the outset, and had resolved within two to three months of the accident. Even so, following a purported follow-up examination of TD by Ma on June 24, 2020 -- more than six months after the accident -- Ma falsely reported that TD continued to suffer from significant levels of pain as the result of the minor, six month-old accident, and recommended that TD return to Jersey Premier for the continued provision of the Fraudulent Services.

(viii)   On December 26, 2019, an Insured named NV was involved in an automobile accident. The contemporaneous police report indicated that NV was not injured and did not complain of any pain at the scene. In keeping with the fact that NV was not seriously injured, NV did not visit any hospital emergency room following the accident. To the extent that NV experienced any health problems at all as the result of the accident, they were of low or minimal severity, and had completely resolved or were minimal within two to three months of the accident. Even so, following a purported follow-up examination of NV by Liu on August 18, 2020 -- more than seven months after the accident -- Liu falsely reported that NV continued to suffer from significant levels of pain as the result of the minor, seven month-old accident, and recommended that NV return to Riverside Pain for the continued provision of the Fraudulent Services.

(ix)    On February 10, 2021, an Insured named RG was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to RG's vehicle and that RG's vehicle was drivable following the accident. The police report further indicated that RG was not injured and did not complain of any pain at the scene. In keeping with the fact that RG was not seriously injured, RG did not visit any hospital emergency room following the accident. To the extent that RG experienced any health problems at all as the result of the accident, they were of low or minimal severity, and had completely resolved or were minimal within two to three months of the accident. Even so, following a purported follow-up examination of RG by Liu on August 31, 2021 -- more than six months after the accident -- Liu falsely reported that RG continued to suffer from pain as the result of the minor, six month-old accident, and recommended that RG return to Riverside Pain for the continued provision of the Fraudulent Services.

(x)    On April 10, 2021, an Insured named YC was involved in an automobile accident. The contemporaneous police report indicated that YC's vehicle was drivable following the accident. The police report further indicated that YC was not injured and did not complain of any pain at the scene. In keeping with the fact that YC was not seriously injured, YC did not visit any hospital emergency room following the accident. To the extent that YC experienced any health problems at all as the result of the accident, they were of low or minimal severity, and had completely resolved or were minimal within two to three months of the accident. Even so, following a purported follow-up examination of YC by Liu on September 16, 2021 -- more than five months after the accident -- Liu falsely reported that YC continued to suffer from significant levels of pain as the result of the minor, five month-old accident, and recommended that YC return to Riverside Pain for the continued provision of the Fraudulent Services.

229.    These are only representative examples. In the claims for follow-up examinations identified in Exhibits "1" and "2", Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu falsely routinely represented that the Insureds continued to suffer from pain and other symptoms as the result of their minor automobile accidents, and long after any legitimate symptoms arising from the minor underlying accidents would have resolved.

230.    In the claims for follow-up examinations identified in Exhibits "1" and "2", Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu routinely falsely represented that the Insureds continued to suffer pain and other symptoms as the result of minor soft tissue injuries, long after the underlying accidents occurred, because these phony diagnoses provided a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds.

76

**d.      Misrepresentations Regarding the Reimbursability of the Follow-Up Examinations at Jersey Premier**

231.    Not only did Jersey Premier, Mingoia, and Baran routinely falsely represent that their putative follow-up examinations involved presenting problems of low to moderate severity or moderate to high severity, and not only did they misrepresent the results of the follow-up examinations, but they also routinely misrepresented the reimbursable amount for the follow-up examinations.

232.    The No-Fault Laws provide that follow-up examinations may only be billed contemporaneously with services such as chiropractic treatments if one of the following four circumstances is present:

  (i)      there is a definite measurable change in the patient's condition requiring significant change in the treatment plan;

  (ii)     the patient fails to respond to treatment, requiring a change in the treatment plan;

  (iii)    the patient's condition becomes permanent and stationary, or the patient is ready for discharge; or

  (iv)     it is medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

See N.J.A.C. 11:3-29.4(n).

233.    Even so, Jersey Premier, Mingoia, and Baran routinely billed for follow-up examinations contemporaneously with chiropractic services, despite: (i) the absence of a definite measurable change in the patient's condition requiring significant change in the treatment plan; (ii) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (iii) the absence of any situation in which the patient's condition became permanent, or a situation in which the patient was ready for discharge; and (iv) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

234.    For example:

(i)     Jersey Premier, Mingoia, and Baran billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic to an Insured named BA on March 12, 2019, April 16, 2019, and May 15, 2019 despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Jersey Premier, Mingoia, and Baran were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(ii)    Jersey Premier, Mingoia, and Baran billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic to an Insured named JA on August 12, 2019 and September 16, 2019 despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Jersey Premier, Mingoia, and Baran were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(iii)   Jersey Premier, Mingoia, and Baran billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic to an Insured named TD on December 16, 2019, January 16, 2020, February 17, 2020, and May 13, 2020 despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Jersey Premier, Mingoia, and Baran were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services

(iv)    Jersey Premier, Mingoia, and Baran billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic to an Insured named MM on January 15, 2020 despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Jersey Premier, Mingoia, and Baran were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(v)  Jersey Premier, Mingoia, and Baran billed GEICO for the follow-up examinations they purported to provide contemporaneously with chiropractic to an Insured named AF on February 20, 2021, March 20, 2021,  May 1, 2021, June 5, 2021, July 10, 2021, and August 14, 2021 despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Jersey Premier, Mingoia, and Baran were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

235.    Each and every time that Jersey Premier, Mingoia, Baran, Riverside Pain, and Liu falsely represented that they were entitled to be reimbursed for these putative follow-up examinations constituted a separate violation of N.J.S.A. § 39:6A--4.6 and N.J.A.C. 11:3--29.6.

**3.      The Fraudulent Charges for Pain Management Injections at Riverside Pain**

236.    As forth in Exhibit "2", based upon the phony, boilerplate "diagnoses" that Riverside Pain and Liu provided during their fraudulent examinations, Riverside Pain and Liu purported to subject most Insureds to a series of medically unnecessary pain management injections, including but not limited to epidural injections and facet injections.

237.    As set forth in Exhibit "2", Riverside Pain and Liu then billed the pain management injections to GEICO under CPT codes 62321, 64483, 64484, 64490, 64491, 64493, and 64494.

238.    Liu purported to personally administer virtually all of the pain management injections in the claims identified in Exhibit "2".

239.    Like the charges for the other Fraudulent Services, the charges for the pain management injections identified in Exhibit "2" were fraudulent in that the injections were medically unnecessary, and were performed -- to the extent that they were performed at all -- pursuant to the phony, boilerplate "diagnoses" provided during the Defendants' pre-determined protocol.

240.     Moreover, in the claims for pain management injections identified in Exhibit "2", the charges for the pain management injections were fraudulent in that they misrepresented Riverside Pain and Liu's eligibility to collect PIP Benefits in the first instance.

241.     As set forth above, Riverside Pain never was eligible to collect PIP Benefits in connection with the claims identified in Exhibit "2", because -- as a result of the fraudulent scheme described herein -- neither it nor the injections were in compliance with all significant laws and regulations governing healthcare practice.

**a.     Basic, Legitimate Use of Pain Management Injections**

242.     Generally, when a patient presents with a soft tissue injury such as a sprain or strain secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and -- if applicable -- elevation of the affected body part.

243.     If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

244.     Typically, invasive pain management injections, which entail a degree of risk to the patient that is absent in more conservative forms of treatment, should not be administered unless a patient has failed more conservative treatments, including chiropractic treatment, physical therapy, and pain management medication.

245.     In fact, however, the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all, and, as a result, pain management injections will only be medically necessary in atypical cases.

246.    In a legitimate clinical setting, pain management injections should not be administered more than once every two months, and multiple varieties of pain management injections should not be administered simultaneously.

247.    This is because: (i) properly administered pain management injections should provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the injections, the pain may be caused by something more serious than a soft tissue injury caused by an automobile accident, and the perpetuating factors of the pain must be identified and managed.

**b.      The Medically Unnecessary Pain Management Injections**

248.    As set forth above, the substantial majority of the Insureds in the claims identified in Exhibit "2" were involved in relatively minor accidents. To the extent that the Insureds in the claims identified in Exhibit "2" experienced any injuries at all in their accidents, the injuries were almost always minor soft tissue injuries such as sprains and strains.

249.    By the time the Insureds in the claims identified in Exhibit "2" presented to Riverside Pain and Liu for treatment, they either had no presenting problems at all as the result of any accidents, or their presenting problems consisted of minor sprains and strains that did not require pain management injections.

250.    Even so, in the claims for pain management injections identified in Exhibit "2", Riverside Pain and Liu:

(i)      routinely provided pain management injections to Insureds who had not suffered any injury more serious than a sprain, strain, or similar soft tissue injury -- months after the underlying accidents, and long after the Insureds' minor soft tissue injuries had resolved; and

(ii)     routinely purported to administer multiple pain management injections, and multiple varieties of pain management injections, to Insureds within a span of weeks, despite the fact that such an injection regimen not only was medically unnecessary, but also placed the Insureds at risk.

251.    For example:

(i)     On February 5, 2018, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to MC's vehicle and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not complain of any pain at the scene. In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved or were minimal within two to three months of the accident. Even so, Riverside Pain and Liu purported to provide MC with two medically unnecessary transforaminal epidural steroid injections under CPT codes 64483 and 64484 on October 4, 2018, two medically unnecessary cervical facet joint injection under CPT codes 64490 and 64491 on November 10, 2018, and a medically unnecessary transforaminal epidural steroid injection under CPT code 64483 on January 31, 2019. These injections were purportedly provided to MC between eight and twelve months after the accident -- and long after any legitimate symptoms MC may have experienced as the result of the accident had resolved.

(ii)    On February 13, 2018, an Insured named IH was involved in an automobile accident. The contemporaneous police report indicated that IH was not injured and did not complain of any pain at the scene. In keeping with the fact that IH was not seriously injured, IH did not visit any hospital emergency room following the accident. To the extent that IH experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved or were minimal within two to three months of the accident. Even so, Riverside Pain and Liu purported to provide IH with two medically unnecessary lumbar facet joint injections under CPT codes 64493 and 64494 on July 21, 2018. These injections were purportedly provided to IH more than five months after the accident -- and long after any legitimate symptoms IH may have experienced as the result of the accident had resolved.

(iii)   On March 1, 2019, an Insured named TU was involved in an automobile accident. The contemporaneous police report indicated that TU was transported to Holy Name Hospital Medical Center with a complaint of shoulder pain. In keeping with the fact that TU was not seriously injured in the accident, hospital records indicate that TU was briefly observed on an outpatient basis, and then was discharged with a shoulder strain diagnosis. To the extent that TU experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved within two to three months of the accident. Even so,

Riverside Pain and Liu purported to provide TU with two medically unnecessary cervical facet joint injections under CPT codes 64490, 64491 on September 19, 2021, two medically unnecessary facet joint injections on May 20, 2021, and a medically unnecessary injection under CPT code 62321 on June 17, 2021. These injections were purportedly provided to TU between six and twenty-six months after the accident -- and long after any legitimate symptoms TU may have experienced as the result of the accident had resolved.

(iv)    On July 5, 2019, an Insured named TT was involved in an automobile accident. The contemporaneous police report indicated that TT's vehicle was drivable following the accident. The police report further indicated that TT was not injured and did not complain of any pain at the scene. In keeping with the fact that TT was not seriously injured, TT did not visit any hospital emergency room following the accident. To the extent that TT experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved or were minimal within two to three months of the accident.  Even so, Riverside Pain and Liu purported to provide TT with two medically unnecessary cervical facet joint injections under CPT codes 64490 and 64491on November 7, 2019 and another two medically unnecessary cervical facet joint injections under CPT codes 64490 and 64491 on December 5, 2020. These injections were purportedly provided to TT between four and five months after the accident -- and long after any legitimate symptoms TT may have experienced as the result of the accident had resolved.

(v)    On October 31, 2019, an Insured named TD was involved in an automobile accident. The contemporaneous police report indicated that TD' vehicles was drivable following the accident. The police report further indicated that TD was not injured and did not complain of any pain at the scene. To the extent that TD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved or were minimal within two to three months of the accident.  Even so, Riverside Pain and Liu purported to provide TD with two medically unnecessary transforaminal epidural steroid injections under CPT codes 64483 and 64484 on August 27, 2020. These injections were purportedly provided to TD approximately ten months after the accident -- and long after any legitimate symptoms TD may have experienced as the result of the accident had resolved.

(vi)    On February 8, 2020, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated JC was not injured in the accident and did not complain of any pain at the scene. In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved or were minimal within two to three months of the accident. Even so, Riverside Pain and Liu purported to provide JC with two medically unnecessary transforaminal epidural steroid injections under CPT codes 64483 and 64484 on July 16, 2020, two medically unnecessary cervical facet joint injections

under CPT codes 64490 and 64491 on September 19, 2020, and two medically unnecessary transforaminal epidural steroid injections under CPT codes 64483 and 64484 on December 16, 2020. These injections were purportedly provided to JC between five and ten months after the accident -- and long after any legitimate symptoms JC may have experienced as the result of the accident had resolved.

(vii)    On February 14, 2020, an Insured named HA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to HA's vehicle and that HA's vehicle was drivable following the accident. The police report further indicated that HA was not injured and did not complain of any pain at the scene. In keeping with the fact that HA was not seriously injured, HA did not visit any hospital emergency room following the accident. To the extent that HA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved or were minimal within two to three months of the accident.  Even so, Riverside Pain and Liu purported to provide HA with two medically unnecessary cervical facet joint injection under CPT codes 64490 and 64491 on March 4, 2021, a medically unnecessary facet joint injection under CPT code 64493 on April 22, 2021, and  a medically unnecessary transforaminal epidural steroid injection under CPT code 64483 on June 24, 2021. These injections were purportedly provided to HA between eleven and sixteen months after the accident -- and long after any legitimate symptoms HA may have experienced as the result of the accident had resolved.

(viii)    On December 23, 2020, an Insured named LA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to LA's vehicle and that LA's vehicle  was drivable following the accident. The police report further indicated that although LA complained of pain to her neck, she refused medical attention at the scene. In keeping with the fact that LA was not seriously injured, LA did not visit any hospital emergency room following the accident. To the extent that LA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved or were minimal within two to three months of the accident. Even so, Riverside Pain and Liu purported to provide LA with two medically unnecessary cervical facet joint injection under CPT codes 64490 and 64491 on April 22, 2021, medically unnecessary transforaminal epidural steroid injections under CPT code 64483 on June 10, 2021 and August 26, 2021, and two medically unnecessary cervical facet joint injections under CPT codes 64490 and 64491 on February 3, 2022. These injections were purportedly provided to LA between four and thirteen months after the accident -- and long after any legitimate symptoms LA may have experienced as the result of the accident had resolved.

(ix)    On February 10, 2021, an Insured named RG was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to RG's vehicle and that RG's vehicle was drivable following the accident. The police report further indicated that RG was not injured and did not complain of any pain at the scene. In keeping with the fact that RG was not seriously injured,

RG did not visit any hospital emergency room following the accident. To the extent that RG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved or were minimal within two to three months of the accident.  Even so, Riverside Pain and Liu purported to provide RG with two medically unnecessary cervical facet joint injection under CPT codes 64490 and 64491 on July 8, 2021, two medically unnecessary transforaminal epidural steroid injections under CPT codes 64483 and 64484 on August 26, 2021, and a medically unnecessary transforaminal epidural steroid injection under CPT code 64483 on October 21, 2021.  These injections were purportedly provided to RG between five and ten months after the accident -- and long after any legitimate symptoms RG may have experienced as the result of the accident had resolved.

(x)   On June 4, 2021, an Insured named MG was involved in an automobile accident. The contemporaneous police report indicated that MG's vehicle was drivable following the accident. The police report further indicated that although MG complained of pain to her head, she refused medical attention at the scene. In keeping with the fact that MG was not seriously injured, MG did not visit any hospital emergency room following the accident. To the extent that MG experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, and had completely resolved or were minimal within two to three months of the accident.  Even so, Riverside Pain and Liu purported to provide MG with two medically unnecessary transforaminal epidural steroid injections under CPT codes 64483 and 64484 on November 11, 2021, two a medically unnecessary transforaminal epidural steroid injections under CPT codes 64483 and 64494 on February 24, 2022, and a medically unnecessary cervical epidural steroid injection under CPT code 62321 on March 31, 2022. These injections were purportedly provided to MG between five and nine months after the accident -- and long after any legitimate symptoms MG may have experienced as the result of the accident had resolved.

252.   These are only representative examples. In many the claims for pain management injections in Exhibit "2", Riverside Pain and Liu submitted billing to GEICO for medically unnecessary pain management injections purportedly provided to Insureds who had not suffered any injury more serious than a sprain, strain, or similar soft tissue injury -- months after the underlying accidents, and long after the Insureds minor soft tissue injuries had resolved.

253.   Moreover, and as set forth in Exhibits "2" in order to maximize the fraudulent billing they could submit to GEICO, Riverside Pain and Liu often purported to provide multiple pain management injections -- and multiple varieties of pain management injections -- to Insureds

within a span of weeks, despite the fact that such an injection regimen placed the Insureds at considerable risk.

254.    For example:

(i)     Riverside Pain and Liu purported to provide two facet joint injections to an Insured named JO on March 15, 2018. Then, two weeks later, on March 29, 2018, Riverside Pain and Liu purported to provide another two facet joint injections to JO. Then, less than two months later, Riverside Pain and Liu purported to provide an additional two fact joint injections for a total of six medically unnecessary pain management injections in less than two months.

(ii)    Riverside Pain and Liu purported to provide two facet joint injections to an Insured named CR on February 22, 2018. Then, just six weeks later, on April 5, 2018, Riverside Pain and Liu purported to provide another two facet joint injections to CR for a total of four medically unnecessary pain management injections in less than two months.

(iii)   Riverside Pain and Liu purported to provide two facet joint injections to an Insured named DL on March 29, 2018. Then, less than one month later,  on April 19, 2018, Riverside Pain and Liu purported to provide another two facet joint injections. Then, again less than one month later, on May 10, 2018, Riverside Pain and Liu purported to provide another two facet joint injections to DL for a total of six medically unnecessary pain management injections in less than two months.

(iv)    Riverside Pain and Liu purported to provide two facet joint injections to an Insured named TA on June 7, 2018. Then, less than six weeks later, on June 12, 2018, Riverside Pain and Liu purported to provide another two facet joint injections to TA for a total of four medically unnecessary pain management injections in less than six weeks.

(v)     Riverside Pain and Liu purported to provide two transforaminal steroid injections to an Insured named MC on October 4, 2018. Then, less than six weeks later,  on November 10, 2019, Riverside Pain and Liu purported to provide another two facet joint injections to MC for a total of four medically unnecessary pain management injections in less than six weeks.

(vi)    Riverside Pain and Liu purported to provide two facet joint injections to an Insured named CA on February 15, 2018. Then, less than two months later,  on April 7, 2018, Riverside Pain and Liu purported to provide another two facet joint injections to CA for a total of four medically unnecessary pain management injections in less than two months.

(vii)   Riverside Pain and Liu purported to provide two facet joint injections to an Insured named KT on March 21, 2019. Then, less than two months later,  on May 2, 2019,

Riverside Pain and Liu purported to provide another two facet joint injections to KT for a total of four medically unnecessary pain management injections in less than two months.

(viii)   Riverside Pain and Liu purported to provide two transforaminal epidural steroid injections to an Insured named RB on April 25, 2019. Then, less than a month later, on May 16, 2019, Riverside Pain and Liu purported to provide two facet joint injections to RB for a total of four medically unnecessary pain management injections in less than four weeks.

(ix)    Riverside Pain and Liu purported to provide two transforaminal epidural steroid injections to an Insured named CC on February 11, 2021. Then, less than six weeks later, on March 18, 2021, Riverside Pain and Liu purported to provide two facet joint injections to CC for a total of four medically unnecessary pain management injections in less than six weeks.

(x)     Riverside Pain and Liu purported to provide two transforaminal epidural steroid injections to an Insured named PS on April 1, 2021. Then, less than one month later, on April 29, 2021, Riverside Pain and Liu purported to provide two facet joint injections to PS for a total of four medically unnecessary pain management injections in less than one month

255.    These are only representative examples. Riverside Pain and Liu provided medically-unnecessary injections to many Insureds despite the fact that such injections -- to the extent that they actually occurred -- placed Insureds at a significant risk.

256.    The injections that Riverside Pain and Liu purported to provide can cause significant adverse events including infection, nerve injury, hypotension, anesthetic toxicity, spinal headaches requiring further invasive treatments, or even death.

257.    To the extent that Riverside Pain and Liu actually provided injections to Insureds with the frequency set forth in their billing, Riverside Pain and Liu increased these risks exponentially.

258.    Riverside Pain and Liu's pre-determined treatment protocol, including subjecting patients to multiple injections over the course of a few weeks or months was designed and employed by Riverside Pain and Liu solely to maximize the potential charges that they could

submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

**4.    The Fraudulent Charges for Chiropractic Services and Physical Therapy Services at Jersey Premier**

259.    Jersey Premier, Mingoia, and Baran's fraudulent scheme was aimed, among other things, at providing as many chiropractic and physical therapy services as possible to the Insureds, without regard for medical necessity or the Care Paths.

260.    As set forth in Exhibit "1", Mingoia purported to perform the vast majority of chiropractic and physical therapy services billed to GEICO through Jersey Premier.

261.    As set forth in in Exhibit "1", Jersey Premier, Mingoia, and Baran typically billed the putative chiropractic and physical therapy services to GEICO under CPT codes 97010, 97012, 97035,  97110, 97112,  97116, 97140, 97161,  97162, 97164, 97530, 98940,  98941, and 98943, and/or Health Care Common Procedure Coding System ("HCCPCS") code G0283.

262.    Like the charges for the other Fraudulent Services, the charges for the chiropractic services and physical therapy services were fraudulent in that the services were medically unnecessary and were performed -- to the extent that they were performed at all -- solely to financially enrich the Defendants, not to treat or otherwise benefit the Insureds who were subjected to them.

263.    Jersey Premier, Mingoia, and Baran knew that -- unless they could create a false basis to provide long-term, medically unnecessary chiropractic and physical therapy services to the Insureds in the claims identified in in Exhibit "1", their ability to provide such long-term, medically unnecessary treatments would be limited by the Care Paths.

264.    Accordingly, Jersey Premier, Mingoia, and Baran used the phony, fabricated "diagnoses" provided during the fraudulent initial and follow-up examinations, and well as the

unlawful cross-referrals from Riverside Pain and Liu, as a false basis to bill for months of medically unnecessary chiropractic treatment and/or physical therapy treatment in gross deviation from the Care Paths.

265. For example:

(i)     On December 31, 2017, an Insured named AA was involved in an automobile accident. The contemporaneous police report indicated that AA was not injured and did not complain of any pain at the scene. Nonetheless, six days later, on January 5, 2018, AA traveled on his own to the Hackensack University Medical Center Emergency Department. The contemporaneous hospital records indicated that AA was briefly observed on an outpatient basis and then discharged with a back pain diagnosis. To the extent that AA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, would have resolved within two to three months of the accident, and did not require over fourteen months of chiropractic and physical therapy treatment. Even so, based on the phony "results" of Jersey Premier, Mingoia, and Baran's putative examinations -- which were intended to provide a false basis to circumvent the ordinary Care Paths -- Jersey Premier, Mingoia, and Baran purported to provide AA with over fourteen  months of purported chiropractic and physical therapy "treatment".

(ii)    On February 5, 2018, an Insured named MC was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to MC's vehicle and that MC's vehicle was drivable following the accident. The police report further indicated that MC was not injured and did not complain of any pain at the scene. In keeping with the fact that MC was not seriously injured, MC did not visit any hospital emergency room following the accident. To the extent that MC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, would have resolved within two to three months of the accident, and did not require over nine months of chiropractic and physical therapy treatment. Even so, based on the phony "results" of Jersey Premier, Mingoia, and Baran's putative examinations -- which were intended to provide a false basis to circumvent the ordinary Care Paths -- Jersey Premier, Mingoia, and Baran purported to provide MC with over nine months of purported chiropractic and physical therapy "treatment".

(iii)   On February 13, 2018, an Insured named IH was involved in an automobile accident. The contemporaneous police report indicated that IH was not injured and did not complain of any pain at the scene. In keeping with the fact that IH was not seriously injured, IH did not visit any hospital emergency room following the accident. To the extent that IH experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, would have resolved within two to three months of the accident, and did not require over eight months of chiropractic and physical therapy treatment. Even so, based on the phony "results" of Jersey Premier, Mingoia, and Baran's putative examinations -- which

were intended to provide a false basis to circumvent the ordinary Care Paths -- Jersey Premier, Mingoia, and Baran purported to provide IH with over eight months of purported chiropractic and physical therapy "treatment".

(iv)     On July 1, 2018, an Insured named HM was involved in an automobile accident. The contemporaneous police report indicated that HM was not injured and did not complain of any pain at the scene. Nonetheless, two days later, on July 3, 2018, HM traveled on her own to the Hoboken University Medical Center Emergency Department. The contemporaneous hospital records indicated that HM was briefly observed on an outpatient basis and then discharged with a cervicalgia diagnosis. To the extent that HM experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, would have resolved within two to three months of the accident, and did not require over twenty months of chiropractic and physical therapy treatment. Even so, based on the phony "results" of Jersey Premier, Mingoia, and Baran's putative examinations -- which were intended to provide a false basis to circumvent the ordinary Care Paths -- Jersey Premier, Mingoia, and Baran purported to provide HM with over twenty months of purported chiropractic and physical therapy "treatment".

(v)      On July 5, 2019, an Insured named TT was involved in an automobile accident. The contemporaneous police report indicated that TT's vehicle was drivable following the accident. The police report further indicated that TT was not injured and did not complain of any pain at the scene. In keeping with the fact that TT was not seriously injured, TT did not visit any hospital emergency room following the accident. To the extent that TT experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, would have resolved within two to three months of the accident, and did not require over ten months of chiropractic and physical therapy treatment. Even so, based on the phony "results" of Jersey Premier, Mingoia, and Baran's putative examinations -- which were intended to provide a false basis to circumvent the ordinary Care Paths -- Jersey Premier, Mingoia, and Baran purported to provide TT with over ten months of purported chiropractic and physical therapy "treatment".

(vi)     On August 2, 2019, an Insured named KA was involved in an automobile accident. The contemporaneous police report indicated that KA' vehicles was drivable following the accident. The police report further indicated that KA was not injured and did not complain of any pain at the scene. In keeping with the fact that KA was not seriously injured, KA did not visit any hospital emergency room following the accident. To the extent that KA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, would have resolved within two to three months of the accident, and did not require over six months of chiropractic and physical therapy treatment. Even so, based on the phony "results" of Jersey Premier, Mingoia, and Baran's putative examinations -- which were intended to provide a false basis to circumvent the ordinary Care Paths -- Jersey Premier, Mingoia, and Baran purported to provide KA with over six months of purported chiropractic and physical therapy "treatment".

(vii)   On October 31, 2019, an Insured named TD was involved in an automobile accident. The contemporaneous police report indicated that TD' vehicles was drivable following the accident. The police report further indicated that TD was not injured and did not complain of any pain at the scene. To the extent that TD experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, would have resolved within two to three months of the accident, and did not require over eleven months of chiropractic and physical therapy treatment. Even so, based on the phony "results" of Jersey Premier, Mingoia, and Baran's putative examinations -- which were intended to provide a false basis to circumvent the ordinary Care Paths -- Jersey Premier, Mingoia, and Baran purported to provide TD with over eleven months of purported chiropractic and physical therapy "treatment".

(viii)  On February 8, 2020, an Insured named JC was involved in an automobile accident. The contemporaneous police report indicated JC was not injured in the accident and did not complain of any pain at the scene. In keeping with the fact that JC was not seriously injured, JC did not visit any hospital emergency room following the accident. To the extent that JC experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, would have resolved within two to three months of the accident, and did not require over fourteen months of chiropractic and physical therapy treatment. Even so, based on the phony "results" of Jersey Premier, Mingoia, and Baran's putative examinations -- which were intended to provide a false basis to circumvent the ordinary Care Paths -- Jersey Premier, Mingoia, and Baran purported to provide o Cardona with over fourteen months of purported chiropractic and physical therapy "treatment".

(ix)    On February 14, 2020, an Insured named HA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to HA's vehicle and that HA's vehicle was drivable following the accident. The police report further indicated that HA was not injured and did not complain of any pain at the scene. In keeping with the fact that HA was not seriously injured, HA did not visit any hospital emergency room following the accident. To the extent that HA experienced any health problems at all as the result of the accident, they were of low or minimal severity, would have resolved within two to three months of the accident, and did not require over nine months of chiropractic and physical therapy treatment. Even so, based on the phony "results" of Jersey Premier, Mingoia, and Baran's putative examinations -- which were intended to provide a false basis to circumvent the ordinary Care Paths -- Jersey Premier, Mingoia, and Baran purported to provide HA with over nine months of purported chiropractic and physical therapy "treatment".

(x)     On December 23, 2020, an Insured named LA was involved in an automobile accident. The contemporaneous police report indicated that there was minor damage to LA's vehicle and that LA's vehicle was drivable following the accident. The police report further indicated that although LA complained of pain to her neck, she refused medical attention at the scene. In keeping with the fact that LA was not seriously injured, LA did not visit any hospital emergency room following the

accident. To the extent that LA experienced any health problems at all as the result of the accident, they were of low or minimal severity at the outset, would have resolved within two to three months of the accident, and did not require over ten months of chiropractic and physical therapy treatment. Even so, based on the phony "results" of Jersey Premier, Mingoia, and Baran's putative examinations -- which were intended to provide a false basis to circumvent the ordinary Care Paths -- Jersey Premier, Mingoia, and Baran purported to provide LA with over ten months of purported chiropractic and physical therapy "treatment".

266.    These are only representative examples. In the claims identified in Exhibit "1" Jersey Premier, Mingoia, and Baran routinely purported to provide months of medically unnecessary chiropractic treatment and/or physical therapy treatment in gross deviation from the Care Paths.

267.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

268.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

269.    It is highly improbable that any two Insureds involved in any one of the relatively minor automobile accidents in the claims identified in Exhibit "1" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of physical therapy and chiropractic treatment.

270.    It is even more improbable -- to the point of impossibility -- that this would occur over and over again.

271.    It likewise is improbable -- to the point of impossibility -- that any two or more Insureds involved in the same minor automobile accident would routinely present for their purported physical therapy and chiropractic treatment on the exact same dates throughout the course of the Insureds' "treatment".

272.     Even so, and in keeping with the fact that, at Jersey Premier, the nature and extent of the physical therapy and chiropractic treatment that each Insured purportedly received was pre-determined, phony, was provided in gross deviation from the Care Paths, and had no legitimate connection to the Insureds' individual circumstances, Jersey Premier, Mingoia, and Baran purported to provide substantially identical, phony physical therapy and chiropractic "treatment" on or about the same dates, to more than one Insured involved in a single accident.

273.     For example:

(i)     On February 3, 2017, two Insureds -- AC and JP -- were involved in an automobile accident. Thereafter, AC and JP both presented -- incredibly -- on the exact same date, February 16, 2017, to Jersey Premier for initial examinations. AC and JP were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that AC and JP suffered any injuries at all in their accident, the injuries were different. Even so, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that AC and JP provided were pre-determined and phony, AC and JP both presented at Jersey Premier on at least 25 of the exact same dates over a twenty month period where they received substantially similar physical therapy and chiropractic treatment on virtually all of those dates.

(ii)    On February 17, 2018, two Insureds -- WG and EG -- were involved in an automobile accident. Thereafter, WG and EG both presented -- incredibly -- on the exact same date, August 1, 2018, to Jersey Premier for initial examinations. WG and EG were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that WG and EG suffered any injuries at all in their accident, the injuries were different. Even so, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that WG and EG provided were pre-determined and phony, WG and EG both presented at Jersey Premier on at least 65 of the exact same dates over a nine month period where they received substantially similar physical therapy and chiropractic treatment on virtually all of those dates.

(iii)   On July 1, 2018, two Insureds -- ZM and HM -- were involved in an automobile accident. Thereafter, ZM and HM both presented -- incredibly -- on the exact same date, July 31, 2018, to Jersey Premier for initial examinations. ZM and HM were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that ZM and HM suffered any injuries at all in their accident, the injuries were different. Even so, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that ZM and HM provided were pre-determined and phony, ZM and HM both presented at Jersey Premier on at least 60 of the exact same dates over a nine  month period

93

where they received substantially similar physical therapy and chiropractic treatment on virtually all of those dates.

(iv)    On December 8, 2018, two Insureds -- LG and AS -- were involved in an automobile accident. Thereafter, LG and AS both presented -- incredibly -- on the exact same date, December 20, 2018, to Jersey Premier for initial examinations. LG and AS were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that LG and AS suffered any injuries at all in their accident, the injuries were different. Even so, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that LG and AS provided were pre-determined and phony, LG and AS both presented at Jersey Premier on at least 70 of the <u>exact</u> same dates over a ten  month period where they received substantially similar physical therapy and chiropractic treatment on virtually all of those dates.

(v)     On January 5, 2019, two Insureds -- MG and MM -- were involved in an automobile accident. Thereafter, MG and MM both presented -- incredibly -- on the exact same date, February 11, 2019, to Jersey Premier for initial examinations. MG and MM were both different ages, in different physical condition, and experienced the impact from different locations in the vehicle. To the extent that MG and MM suffered any injuries at all in their accident, the injuries were different. Even so, and in keeping with the fact that the "diagnoses" and "treatment recommendations" that MG and MM provided were pre-determined and phony, MG and MM both presented at Jersey Premier on at least 30 of the <u>exact</u> same dates over a five month period where they received substantially similar physical therapy and chiropractic treatment on virtually all of those dates.

274.    In the claims identified in Exhibit "1", Jersey Premier, Mingoia, and Baran routinely purported to provide a substantially identical course of medically unnecessary physical therapy and chiropractic treatment to two or more Insureds who routinely appeared for these "treatments" on the exact same dates.

275.    The Defendants' fraudulent scheme enabled them to bill for months of medically unnecessary chiropractic services per Insured and/or months of medically unnecessary physical therapy services per Insured, without regard for the Insureds' true circumstances or presentment.

**5.    The Unlawful Operation of Hudson Radiology Without a Medical Director and in Violation of Significant Regulatory Requirements**

276.    As an ambulatory care facility, Hudson Radiology was required to have a qualified physician medical director on staff, and also had to comply with the numerous other significant

94

regulatory and licensing requirements applicable to ambulatory care facilities, which are designed to protect the public health and welfare.

277.    However, Hudson Radiology did not have a medical director that fulfilled the required duties of an ambulatory care facility medical director.

278.    Moreover, Hudson Radiology operated in pervasive violation of the pertinent ambulatory care facility licensing and operating regulations. For instance, the New Jersey Department of Health (the "NJDOH") cited Hudson Radiology for serious regulatory violations, including, but not limited to:

(i)     failure to develop written job descriptions and ensure that personnel were assigned duties based on their education, training, and competencies, and in accordance with their job descriptions, as required by N.J.A.C. 8:43A-3.5(a);

(ii)    failure to develop and implement a staff orientation plan and staff education place, as required by N.J.A.C 8:43A-3.5(d);

(iii)   failure to ensure that there was a  policy and procedure manual available as required by N.J.A.C 8:43A-3.6(a);

(iv)    failure to develop and implement policies and procedures regarding employee health records, as required by N.J.A.C 8:43A-3.7(a);

(v)     failure to ensure that there was a governing authority in place which assumed legal responsibility for the management, operation, and financial viability of the facility, as required by N.J.A.C 8:43A-4.1(a);.

(vi)    Failure to appoint an administrator who would be accountable to the governing authority, as required N.J.A.C 8:43A-5.1(a);

(vii)   failure to establish and implement written patient care policies and procedures, as required by N.J.A.C. 8:43A-6.1(a);

(viii)  failure to designate a physician to serve as medial director, as required by N.J.A.C. 8:43A-7.2(a);

(ix)    failure to develop and implement written medical policies as required by N.J.A.C. 8:43A-7.4(a);

(x)     failure to develop procedures related to medical staff credentialing, delineation of qualifications, evaluations of medical care, and the granting or revocation of physician privileges, as required by N.J.A.C. 8:43A-7.4(a)(2);

(xi)    failure to develop and implement written policies and procedures for the administration, control, and storage of medication, as required by N.J.A.C. 8:43A-9.3(a);

(xii)   failure to implement written policies and procedures regarding medical records, including regarding the protection of medical records as required by N.J.A.C. 8:43A-13.5(a)(1);

(xiii)  failure to ensure the development of policies and procedures that addressed infection prevention and control as required by N.J.A.C. 8:43A-14.2(b);

(xiv)   failure to ensure the development of policies and regarding the rights of patients as required by N.J.A.C. 8:43A-16.1(a); and

(xv)    failure to ensure the development of policies and procedures that addressed patient safety during the use of all diagnostic equipment as required by N.J.A.C. 8:43A-25.3

279.    These are just some of the many of the serious regulatory violations for which Hudson Radiology was cited. Hudson Radiology's failure to comply with  the significant regulations applicable to ambulatory care facilities -- placed patients at considerable risk, because they were subjected to procedures at Hudson Radiology without the oversight required by the pertinent regulations.

280.    Hudson Radiology engaged in these regulatory violations because -- in further violation of the pertinent regulations -- Hudson Radiology was owned and controlled, in part, by R. Zuberi, a convicted criminal whose focus was on profit, rather than legitimate patient care.

III.    **The Fraudulent Billing Submitted to GEICO**

281.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of HCFA-1500 forms and treatment reports through Jersey Premier, Riverside Pain, and Hudson Radiology containing thousands of fraudulent charges, seeking payment for the Fraudulent Services for which they were not entitled to receive payment.

282.     The HCFA-1500 forms and treatment reports were false and misleading, and in violation of the Insurance Fraud Prevention Act, in the following material respects:

(i)      The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Defendants were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Defendants were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Jersey Premier and Hudson Radiology had an unlawful corporate structure; (b) the Defendants were engaged in an unlawful referral scheme; (c) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; (d) the Defendants routinely violated N.J.S.A. § 39:6A--4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services; and (e) Hudson Radiology failed to comply with significant regulatory and licensing requirements applicable to ambulatory care facilities.

(ii)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Jersey Premier had an unlawful corporate structure; (b) the Defendants were engaged in an unlawful referral scheme; (c) the Defendants purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; (d) the Defendants routinely violated N.J.S.A. § 39:6A--4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services; and (e) Hudson Radiology failed to comply with significant regulatory and licensing requirements applicable to ambulatory care facilities.

(iii)    The HCFA-1500 forms and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to them.

(iv)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

IV.   **GEICO's Justifiable Reliance**

283.   The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

284.   To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

285.   For instance, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed -- to the extent that they were performed at all -- pursuant to a fraudulent, pre-determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to them.

286.   In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were performed, to the extent that they are performed at all, pursuant to illegal self-referrals.

287.   Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

288.   The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time--consuming arbitration against GEICO and other insurers if the charges were not promptly paid in full.

289.   GEICO is under statutory and contractual obligations to promptly and fairly process claims. The facially--valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were

designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $2,400,000.00.

290.     Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against Jersey Premier, Riverside Pain, and Hudson Radiology
### (Declaratory Judgment -- 28 U.S.C. §§ 2201 and 2202)

291.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 290 above.

292.     There is an actual case in controversy between GEICO and Jersey Premier, Riverside Pain, and Hudson Radiology, respectively, as to whether Jersey Premier, Riverside Pain, and Hudson Radiology were in compliance with all significant laws and regulations governing healthcare practice during the time period when billing for the Fraudulent Services was submitted to GEICO.

293.     Between at least 2016 and the present, Jersey Premier was not in compliance with significant laws and regulations governing healthcare practice because of the fraudulent and unlawful scheme described herein.

294.     Between at least 2018 and the present, Riverside Pain was not in compliance with significant laws and regulations governing healthcare practice because of the fraudulent and unlawful scheme described herein.

295.     Between at least 2018 and the present, Hudson Radiology was not in compliance with significant laws and regulations governing healthcare practice because of the fraudulent and unlawful scheme described herein.

296.   Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Jersey Premier, Riverside Pain, and Hudson Radiology were not in compliance with all significant laws and regulations governing healthcare practice in New Jersey.

### SECOND CAUSE OF ACTION
**Against Jersey Premier, Mingoia, and Baran**
**(Violation of New Jersey Insurance Fraud Prevention Act -- (N.J.S.A.17:33A--1 et seq.))**

297.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 290 above.

298.   In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "1", Jersey Premier, Mingoia, and Baran knowingly submitted or caused to be submitted HCFA-1500 forms and treatment reports to GEICO that were false and misleading in the following material respects:

(i)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that Jersey Premier, Mingoia, and Baran were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, Jersey Premier, Mingoia, and Baran were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Jersey Premier, Mingoia, and Baran were engaged in an unlawful referral scheme; (b) Jersey Premier had an unlawful corporate structure; (c) Jersey Premier, Mingoia, and Baran purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (d) Jersey Premier, Mingoia, and Baran routinely violated N.J.S.A. § 39:6A--4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(ii)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Jersey Premier, Mingoia, and Baran uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Jersey Premier, Mingoia, and Baran were engaged in an unlawful referral scheme; (b) Jersey Premier had an unlawful corporate

structure; (c) Jersey Premier, Mingoia, and Baran purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (d) Jersey Premier, Mingoia, and Baran routinely violated N.J.S.A. § 39:6A--4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(iii)     The HCFA-1500 forms and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich Jersey Premier, Mingoia, and Baran, not to benefit the Insureds who supposedly were subjected to them.

(iv)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Jersey Premier, Mingoia, and Baran misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

299.     Jersey Premier, Mingoia, and Baran's systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33--A--7.

300.     As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $800,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

**THIRD CAUSE OF ACTION**
**Against Mingoia and Baran**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

301.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 290 above.

302.     Jersey Premier is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

303.    Mingoia and Baran have knowingly conducted and/or participated, directly or indirectly, in the conduct of Jersey Premier's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Jersey Premier was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Jersey Premier, Mingoia, and Baran; (iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Jersey Premier, Mingoia, and Baran were engaged in an illegal referral scheme; and (vi) neither Jersey Premier nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

304.    Jersey Premier's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Mingoia and Baran have operated Jersey Premier, inasmuch as Jersey Premier is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Jersey Premier to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Mingoia and Baran continue to submit fraudulent billing to GEICO,

and continue to attempt collection on the fraudulent billing submitted through Jersey Premier to the present day.

305.    Jersey Premier is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Jersey Premier in pursuit of inherently unlawful goals -- namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

306.    GEICO has been injured in its business and property by reason of the above-- described conduct in that it has paid at least $800,000.00 pursuant to the fraudulent bills submitted through Jersey Premier.

307.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Jersey Premier, Mingoia, and Baran
### (Common Law Fraud)

308.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 290 above.

309.    Jersey Premier, Mingoia, and Baran intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

310.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "1", the representation that Jersey Premier, Mingoia, and Baran were in compliance with all significant laws and regulations governing healthcare practice in New Jersey, when in fact they were not; (ii) in every claim

identified in Exhibit "1", the representation that Jersey Premier, Mingoia, and Baran were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich Jersey Premier, Mingoia, and Baran, not to benefit the Insureds who supposedly were subjected to them; (iv) in many of the claims identified in Exhibit "1", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (v) in every claim identified in Exhibit "1", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

311.    Jersey Premier, Mingoia, and Baran intentionally made the above--described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Jersey Premier that were not compensable under New Jersey's No-Fault Laws.

312.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above--described conduct in that it has paid at least $800,000.00  pursuant to the fraudulent bills submitted by Jersey Premier, Mingoia, and Baran through Jersey Premier.

313.    Jersey Premier, Mingoia, and Baran's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

314.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Jersey Premier, Mingoia, and Baran**
**(Unjust Enrichment)**

315.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 290 above.

316.     As set forth above, Jersey Premier, Mingoia, and Baran have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

317.     When GEICO paid the bills and charges submitted or caused to be submitted through Jersey Premier, Mingoia, and Baran for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Jersey Premier, Mingoia, and Baran's improper, unlawful, and/or unjust acts.

318.     Jersey Premier, Mingoia, and Baran have been enriched at GEICO's expense by GEICO's payments which constituted a benefit Jersey Premier, Mingoia, and Baran voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

319.     Jersey Premier, Mingoia, and Baran's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

320.     By reason of the above, Jersey Premier, Mingoia, and Baran have been unjustly enriched in an amount to be determined at trial, but in no event less than $800,000.00.

**SIXTH CAUSE OF ACTION**
**Against Riverside Pain and Liu**
**(Violation of New Jersey Insurance Fraud Prevention Act -- (N.J.S.A.17:33A--1 et seq.))**

321.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 290 above.

105

322.     In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "2", Riverside Pain and Liu knowingly submitted or caused to be submitted HCFA-1500 forms and treatment reports to GEICO that were false and misleading in the following material respects:

(i)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that Riverside Pain and Liu were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, Riverside Pain and Liu were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Riverside Pain and Liu were engaged in an unlawful referral scheme; (b) Riverside Pain and Liu purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) Riverside Pain and Liu routinely violated N.J.S.A. § 39:6A--4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(ii)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Riverside Pain and Liu uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Riverside Pain and Liu were engaged in an unlawful referral scheme; (b) Riverside Pain and Liu purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) Riverside Pain and Liu routinely violated N.J.S.A. § 39:6A--4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(iii)     The HCFA-1500 forms and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich Riverside Pain and Liu, not to benefit the Insureds who supposedly were subjected to them.

(iv)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Riverside Pain and Liu misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

323.     Riverside Pain and Liu's systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33--A--7.

324.     As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $300,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

**SEVENTH CAUSE OF ACTION**
**Against Liu**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

325.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 290 above.

326.     Riverside Pain is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

327.     Liu has knowingly conducted and/or participated, directly or indirectly, in the conduct of Riverside Pain's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over five years seeking payments that Riverside Pain was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Riverside Pain and Liu; (iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Riverside Pain and Liu were engaged in an illegal

referral scheme; and (vi) neither Riverside Pain nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

328.    Riverside Pain's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Liu has operated Riverside Pain, inasmuch as Riverside Pain is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Riverside Pain to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Liu continue to submit fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Riverside Pain to the present day.

329.    Riverside Pain is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Riverside Pain in pursuit of inherently unlawful goals -- namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

330.    GEICO has been injured in its business and property by reason of the above-- described conduct in that it has paid at least $300,000.00 pursuant to the fraudulent bills submitted through Riverside Pain.

331.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**Against Riverside Pain and Liu**
**(Common Law Fraud)**

332.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 290 above.

333.    Riverside Pain and Liu intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

334.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "2", the representation that Riverside Pain and Liu were in compliance with all significant laws and regulations governing healthcare practice in New Jersey, when in fact they were not; (ii) in every claim identified in Exhibit "2", the representation that Riverside Pain and Liu were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich Riverside Pain and Liu, not to benefit the Insureds who supposedly were subjected to them; (iv) in many of the claims identified in Exhibit "2", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (v) in every claim identified in Exhibit "2", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

335.    Riverside Pain and Liu intentionally made the above--described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay

charges submitted through Riverside Pain that were not compensable under New Jersey's No-Fault Laws.

336.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above--described conduct in that it has paid at least $300,000.00  pursuant to the fraudulent bills submitted by Riverside Pain and Liu through Riverside Pain.

337.    Riverside Pain and Liu's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

338.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Riverside Pain and Liu
### (Unjust Enrichment)

339.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 290 above.

340.    As set forth above, Riverside Pain and Liu have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

341.    When GEICO paid the bills and charges submitted or caused to be submitted through Riverside Pain and Liu for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Riverside Pain and Liu's improper, unlawful, and/or unjust acts.

342.    Riverside Pain and Liu have been enriched at GEICO's expense by GEICO's payments which constituted a benefit Riverside Pain and Liu voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

343.     Riverside Pain and Liu's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

344.     By reason of the above, Riverside Pain and Liu have been unjustly enriched in an amount to be determined at trial, but in no event less than $300,000.00.

**TENTH CAUSE OF ACTION**
**Against Hudson Radiology, Jaloudi, and D. Zuberi**
**(Violation of New Jersey Insurance Fraud Prevention Act -- (N.J.S.A.17:33A--1 et seq.))**

345.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 290 above.

346.     In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "3", Hudson Radiology, Jaloudi, and D. Zuberi knowingly submitted or caused to be submitted HCFA-1500 forms and treatment reports to GEICO that were false and misleading in the following material respects:

(i)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that Hudson Radiology, Jaloudi, and D. Zuberi were in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, Hudson Radiology, Jaloudi, and D. Zuberi were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Hudson Radiology, Jaloudi, and D. Zuberi were engaged in an unlawful referral scheme; (b) Hudson Radiology, Jaloudi, and D. Zuberi purported to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) Hudson Radiology, Jaloudi, and D. Zuberi routinely violated N.J.S.A. § 39:6A--4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(ii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Riverside Pain and Liu uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice, and therefore were not eligible to receive PIP reimbursement, because: (a) Hudson Radiology, Jaloudi, and D. Zuberi were engaged in an unlawful referral scheme; (b) Hudson Radiology, Jaloudi, and D. Zuberi purported

111

to provide, and billed for, the medically unnecessary and in some cases illusory Fraudulent Services; and (c) Hudson Radiology, Jaloudi, and D. Zuberi routinely violated N.J.S.A. § 39:6A--4.6(c) by inflating, exaggerating, and misrepresenting their charges for the Fraudulent Services.

(iii)   The HCFA-1500 forms and treatment reports uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary. In fact, the Fraudulent Services were not medically necessary, and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich Hudson Radiology, Jaloudi, and D. Zuberi, not to benefit the Insureds who supposedly were subjected to them.

(iv)   The HCFA-1500 forms and treatment reports submitted or caused to be submitted by Hudson Radiology, Jaloudi, and D. Zuberi misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

347.   Hudson Radiology, Jaloudi, and D. Zuberi's systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33--A--7.

348.   As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $300,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

## ELEVENTH CAUSE OF ACTION
### Against Jaloudi and D. Zuberi
### (Violation of RICO, 18 U.S.C. § 1962(c))

349.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 290 above.

350.   Hudson Radiology is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

351.    Jaloudi and D. Zuberi have knowingly conducted and/or participated, directly or indirectly, in the conduct of Hudson Radiology's affairs through a pattern of racketeering activities consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over five years seeking payments that Hudson Radiology was not entitled to receive under the No-Fault Laws because: (i) the billed-for services were not medically necessary; (ii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich Hudson Radiology, Jaloudi and D. Zuberi; (iii) the billed-for services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; (v) Hudson Radiology, Jaloudi and D. Zuberi were engaged in an illegal referral scheme; and (vi) neither Hudson Radiology nor the underlying services were in compliance with applicable law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

352.    Hudson Radiology's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Jaloudi and D. Zuberi have operated Hudson Radiology, inasmuch as Hudson Radiology is not engaged in a legitimate chiropractic practice, and acts of mail fraud therefore are essential in order for Hudson Radiology to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Jaloudi and D. Zuberi continue to submit

fraudulent billing to GEICO, and continue to attempt collection on the fraudulent billing submitted through Hudson Radiology to the present day.

353.   Hudson Radiology is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Hudson Radiology in pursuit of inherently unlawful goals -- namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

354.   GEICO has been injured in its business and property by reason of the above--described conduct in that it has paid at least $1,300,000.00 pursuant to the fraudulent bills submitted through Hudson Radiology.

355.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TWELFTH CAUSE OF ACTION**
**Against Hudson Radiology, Jaloudi and D. Zuberi**
**(Common Law Fraud)**

356.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 290 above.

357.   Hudson Radiology, Jaloudi and D. Zuberi intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges seeking payment for the Fraudulent Services.

358.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim identified in Exhibit "3", the representation that Hudson Radiology, Jaloudi and D. Zuberi were in compliance with all significant laws and regulations

114

governing healthcare practice in New Jersey, when in fact they were not; (ii) in every claim identified in Exhibit "3", the representation that Hudson Radiology, Jaloudi and D. Zuberi were eligible to receive PIP Benefits, when in fact they were not; (iii) in every claim identified in Exhibit "3", the representation that the Fraudulent Services were medically necessary, when in fact the Fraudulent Services were not medically necessary and were performed as part of a pre-determined fraudulent treatment and billing protocol designed solely to financially enrich Hudson Radiology, Jaloudi and D. Zuberi, not to benefit the Insureds who supposedly were subjected to them; (iv) in many of the claims identified in Exhibit "3", the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; and (v) in every claim identified in Exhibit "3", the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice, and were eligible for PIP reimbursement, when in fact they were not.

359.    Hudson Radiology, Jaloudi and D. Zuberi intentionally made the above--described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Hudson Radiology that were not compensable under New Jersey's No-Fault Laws.

360.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above--described conduct in that it has paid at least $1,300,000.00 pursuant to the fraudulent bills submitted by Hudson Radiology, Jaloudi and D. Zuberi through Hudson Radiology.

361.    Hudson Radiology, Jaloudi and D. Zuberi's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

362.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
### Against Hudson Radiology, Jaloudi and D. Zuberi
### (Unjust Enrichment)

363.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 290 above.

364.    As set forth above, Hudson Radiology, Jaloudi and D. Zuberi have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

365.    When GEICO paid the bills and charges submitted or caused to be submitted through Hudson Radiology, Jaloudi and D. Zuberi for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Hudson Radiology, Jaloudi and D. Zuberi's improper, unlawful, and/or unjust acts.

366.    Hudson Radiology, Jaloudi and D. Zuberi have been enriched at GEICO's expense by GEICO's payments which constituted a benefit Hudson Radiology, Jaloudi and D. Zuberi voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

367.    Hudson Radiology, Jaloudi and D. Zuberi's retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

368.    By reason of the above, Hudson Radiology, Jaloudi and D. Zuberi have been unjustly enriched in an amount to be determined at trial, but in no event less than $1,300,000.00.

## **JURY DEMAND**

369.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against Jersey Premier, Riverside Pain, and Hudson Radiology, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Jersey Premier, Riverside Pain, and Hudson Radiology were not in compliance with all significant laws and regulations governing healthcare practice during the time period when billing for the Fraudulent Services was submitted to GEICO;

B.    On the Second Cause of Action against Jersey Premier, Mingoia, and Baran, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $800,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

C.    On the Third Cause of Action against Mingoia and Baran, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $800,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Jersey Premier, Mingoia, and Baran, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $800,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.      On the Fifth Cause of Action against Jersey Premier, Mingoia, and Baran, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $800,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Riverside Pain and Liu,  damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $300,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

G.      On the Seventh Cause of Action against Liu, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $300,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Riverside Pain and Liu, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $300,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.      On the Ninth Cause of Action against Riverside Pain and Liu, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $300,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

J.      On the Tenth Cause of Action against Hudson Radiology, Jaloudi, and D. Zuberi, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $1,300,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees

incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

K.      On the Eleventh Cause of Action against Jaloudi and D. Zuberi, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,300,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.      On the Twelfth Cause of Action against Hudson Radiology, Jaloudi, and D. Zuberi, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,300,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.      On the Thirteenth Cause of Action against Hudson Radiology, Jaloudi, and D. Zuberi, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $1,300,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper.

Dated:  December 8, 2022

RIVKIN RADLER LLP

By:   *s/ Gene Y. Kang*
     Gene Y. Kang, Esq.
     Barry I. Levy, Esq. (to be admitted *pro hac vice*)
     Max Gershenoff, Esq. (to be admitted *pro hac vice*)
     Yonatan Bernstein, Esq.
     25 Main Street, Suite 501
     Court Plaza North
     Hackensack, New Jersey 07601
     (201) 287-2460